IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CMA CGM, S.A., <br><br> Plaintiff-Counterdefendant, <br><br> v. <br><br> WATERFRONT CONTAINER LEASING COMPANY, INC., <br><br> Defendant-Counterclaimant. | Case No.: 12-cv-5467 JSC <br><br> **ORDER GRANTING CMA'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

In this shipping container contract case, the parties dispute which of two unsigned versions of a lease agreement governs their contractual relationship. Plaintiff CMA CGM, S.A. ("CMA") moves for summary judgment on its breach of contract claim, arguing that Defendant Waterfront Container Leasing Company, Inc. ("Waterfront") breached the operative contract's purchase option provision. (Dkt. No. 24.) After carefully considering the evidence properly submitted, and having had the benefit of oral argument on October 10, 2013, the Court GRANTS CMA's motion.

**SUMMARY JUDGMENT EVIDENCE**

In early 2007, CMA, a French corporation that owns and operates cargo ships, purchased Cheng Lie Navigation Company, Ltd. ("Cheng Lie"), which had over 7,000 shipping containers on

lease from Waterfront, a corporation based in San Francisco. In or around March 2007, CMA took possession of the containers. Sometime soon after, the parties commenced negotiations for a new lease intended to cover CMA's take-over of the containers that Cheng Lie had on lease from Waterfront. Although the parties appear to have negotiated over several separate leases, the lease at issue here is Lease 7006, which was a five-year term lease for 7,271 containers.

While the parties appear to disagree on the exact sequence and content of their negotiations, the parties agree that on May 5, 2007, Scott Hu, Waterfront employee and son of Howard Hu, Waterfront's President, emailed CMA's Logistic Manager, Bernard Isoard, a draft version of Lease 7006.[1] This version includes a purchase option provision, which provided CMA the option to purchase the containers it was leasing at specific prices for each type of container:

> Lessee is granted a Purchase Option provided that Equipment remains continuously under lease for a minimum period of Five (5) years and subject to the limitation that the sale will be for the totality of the units under lease at the time of the conclusion of the agreed lease period. Unit purchase price shall be as follows.
>
> 20' Dry Cargo Container: US$750.00
>
> 40' Dry Cargo Container: US$1,200.00
>
> 40' HC Dry Cargo Container: US$1,300.00
>
> Lessee shall notify Lessor of intent to exercise the Purchase Option by Sixty (60) day written notice. Lessor shall issue an invoice for the amount due and Lessee shall pay such invoice before the conclusion date of the lease period as set forth in the Recitals above. Title shall pass to Lessee following receipt of Purchase Option price and per diem rates up to and including the last day of the agreed lease period.

(Dkt. No. 25-1, Ex. 3 ¶ 2.) Scott Hu testified that the purchase option provision was requested by Isoard:

> Q: Who initiated the idea or the concept of a purchase option?
>
> A: CMA. Bernard [Isoard] requested it.
>
> Q: Eventually also prices for the purchase option made their way into at least a draft. Were those negotiated, those prices?
>
> A: Yes.

---

[1] The parties agree that negotiations began on April 17, 2007, with an in-person meeting in Norfolk, Virginia with Scott Hu and Isoard.

2

> Q: Between whom?
>
> A: Between Bernard and myself.

(Dkt. No. 25-1, Ex. 1 at 27:4-12.)  The provision and the purchase prices were negotiated sometime between April 17, 2007 and the emailing of the May 5 draft.

Hu's email asked Isoard to review the draft and explained that "[i]f everything is OK, we will prepare the Final Draft after receiving your confirmation." (Dkt. No. 25-1, Ex. 3 at 45.)  The parties dispute whether Isoard sent a confirmation to Hu or anyone else at Waterfront.  Nonetheless, it is undisputed that sometime between May 5, 2007 and June 7, 2007, Waterfront sent CMA hardcopies of Lease 7006 with the identical terms that had been set out in the May 5 draft.  These hardcopies were in triplicate (one marked "Lessor," one marked "Lessee," and one marked "Office"), on corporate letterhead bond stationary.  Scott Hu testified as to his intent in sending the hardcopies:

> Q: When you sent these originals or when [another Waterfront employee] sent these originals . . . at that time it was your intent that this would be the final contract, correct?
>
> A: That's correct

(Dkt. No. 34 p. 3-4, 57:25-58:5.)  It is undisputed that prior to the initiation of the present dispute CMA never returned to Waterfront a signed copy of Lease 7006.

A spreadsheet created by Waterfront documenting CMA's monthly payment obligations up until June of this year indicates that on June 1, 2007 it began invoicing CMA for the containers under Lease 7006.  (Dkt. No. 25-2, Ex. 9 at 45.)[2]

On June 7, 2007, Waterfront sent CMA a replacement page for Lease 7006, correcting CMA's billing address, which Waterfront instructed CMA to insert into the three originals (Lessor/Lessee/Office).

"[F]our to five months" after Waterfront sent CMA Lease 7006 in triplicate—thus, approximately sometime between September and November 2007—Scott Hu twice emailed Isoard a revised version of Lease 7006,[3] which was exactly the same as the earlier versions except it included

---

[2] Waterfront, however, did not receive CMA's first lease payment until October 11, 2007. (*Id.*)
[3] No record of these emails appears to exist and Waterfront has produced no evidence of the content of these emails other than the attached revised agreement.

3

1  a default provision.  (Dkt. No. 31-4, Ex. D at 38:7-16, 58:17-23.)  This default provision voids
2  CMA's purchase option upon a default by CMA: "Lessee may not elect the Purchase Option if a
3  default, or an event of default, or an event which would become a default with the passage of time, or
4  giving notice of both, has occurred."  (Dkt. No. 31-4, Ex. A ¶ 2.)  According to Waterfront, such
5  default includes late lease payments.  Waterfront added this default provision to all its "pending
6  unsigned draft contracts, including the one with CMA."  (Dkt. No. 31-1 ¶ 4.)  Scott Hu testified that
7  the default provision was meant to "add some clarifying language to the contracts."  (Dkt. No. 31-4,
8  Ex. D at 58:6-11.)  There is nothing in the record to indicate that the parties negotiated the default
9  provision, and Waterfront does not contend that it was ever discussed with CMA.

10  Having not received any response from his late 2007 emails, Scott Hu personally handed
11  Isoard a set of duplicate originals of the revised contract containing the default provision during a
12  December 2007 conference both men were attending.  Although Hu testified that he told Isoard that
13  "we've made some changes from the one we previously gave you," he admits that he never
14  specifically identified the addition of the default provision.  (Dkt. No. 31-4, Ex. D at 77:19-78:21.)
15  Hu asked Isoard to have CMA sign and return the contracts, but CMA never did.

16  On January 30, 2012, CMA sent Waterfront a "Purchase Option Notice," which provided:
17  "We hereby confirm that we envisage to exercise the purchase option for [Lease 7006]."  (Dkt. No.
18  25-2, Ex. 10.)  Waterfront responded in writing the next day, informing CMA that it was in default of
19  its lease payments, triggering the default provision, and thus precluding "any discussion of the
20  Purchase Option at this juncture."  (Dkt. No. 13-2, Ex. B.)

21  On May 8, 2012, Waterfront gave notice to CMA that it was terminating Lease 7006 because
22  CMA had failed to cure its default.

23  CMA filed this lawsuit five months later, bringing causes of action for breach of maritime
24  contract, promissory estoppel, specific performance, and declaratory relief.  Waterfront
25  counterclaimed, alleging several breach of contract causes of action.  The Court previously granted
26  Waterfront's motion for partial summary judgment, concluding that CMA had breached Lease 7006
27  by failing to pay per diem fees for containers remaining in its possession since May 1, 2012, after the
28  lease expired.  (Dkt. No. 19.)  Because the competing versions of Lease 7006 each contained the

4

same provision at issue on that motion, the Court did not need to resolve which version was the operative contract.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial . . . and persuade the court that there is no genuine issue of material fact." *Id.*

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. If the nonmoving party fails to do so, "the moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id*. In deciding whether there exist genuine issues of material fact, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

CMA moves for summary judgment on its claim that Waterfront breached Lease 7006 when it refused to honor the purchase option. Central to CMA's motion is its contention that the initial version of Lease 7006—the version without the default provision—is controlling. Waterfront argues that the second version, which includes the default provision, is governing, or that at least there is a material dispute of fact as to whether the second version governs.[4] Waterfront asserts that because

---

[4] Waterfront's opposition to the motion does *not* argue that neither version of the contract is controlling. The Court specifically asked Waterfront at the hearing on this motion if it is asserting that neither version governs and Waterfront responded "no."

"the longest performance" occurred under the second version of the lease, the second version trumps the first. (Dkt. No. 31 at 9.) CMA also argues, in the alternative, that there is a binding oral contract between the parties that does not include the default provision. In addition, Waterfront contends that under either version, CMA's alleged exercise of the purchase option was ineffective because CMA had defaulted on its lease payments. Finally, Waterfront asserts that its May 8, 2012 termination of the contract "voided whatever rights CMA had under the Purchase Option." (*Id.*) None of Waterfront's arguments is persuasive.

### A. The First Version of Lease 7006 is the Operative Contract

The parties agree that California Uniform Commercial Code ("UCC") Division 10, concerning leases, governs Lease 7006. A personal property lease may be made "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a lease contract." Cal. Com. Code § 10204(a). Further, "[a]n agreement sufficient to constitute a lease contract may be found although the moment of its making is undetermined." *Id.* at § 10204(b). Regarding offer and acceptance, "[u]nless otherwise unambiguously indicated by the language or circumstances, an offer to make a lease contract must be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *Id.* at § 2206(a). Finally, while a lease contract is not enforceable unless there is a writing signed by the party against whom enforcement is sought, *see id.* at § 10201(a)(2), a lease contract that is not signed, but which is valid in other respects, is enforceable "[w]ith respect to goods that have been received and accepted by the lessee," *id.* at § 10201(d)(3).

#### 1. Waterfront Offered to Contract Under the Terms of the First Version

The first version of the contract Waterfront sent in triplicate to CMA constitutes an offer as a matter of law. Scott Hu testified that the first version sent in triplicate was the final agreement:

> Q: When you sent these originals or when [another Waterfront employee] sent these originals . . . at that time it was your intent that this would be the final contract, correct?
>
> A: That's correct.

(Dkt. No. 34 p. 3-4, 57:25-58:5.) In addition, Waterfront admits that sending the first version of Lease 7006 in triplicate was consistent with its procedures in presenting an offer: Hu testified that it

6

1   was Waterfront's practice to send a draft of an agreement, and then once the draft is returned with
2   comments or confirmed, Waterfront would prepare a final draft and send it in triplicate for the client
3   to sign. (Dkt. No. 31-4 p. 41, 55-56.) Finally, it is undisputed that on June 7, 2007, Waterfront sent
4   CMA a replacement page for Lease 7006, correcting CMA's billing address, which Waterfront
5   instructed CMA to insert into the three originals (Lessor/Lessee/Office). If the first version sent in
6   triplicate was actually a draft open to revision, it would not have been necessary to provide CMA
7   with three replacement pages correcting a billing address.

8         Waterfront does not seriously dispute that the first version sent in triplicate constitutes an
9   offer. Although Waterfront's briefing describes the first as a "draft," Waterfront also labels the
10  second version with the default provision—which it contends was offered and accepted—a "revised
11  draft." (*See, e.g.*, Dkt. No. 31 at 3, 7.) Waterfront cannot have it both ways. Further, Waterfront
12  identifies no objective evidence that would support a finding that the first version, sent in triplicate on
13  corporate letterhead bond stationary, was not intended to be an offer. *See Rennick v. O.P.T.I.O.N.*
14  *Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) ("[T]here is no contract where the *objective*
15  manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent
16  agreement is made." (emphasis added)). Although Waterfront advised CMA that it would send a
17  "Final Draft after receiving your confirmation," (Dkt. No. 25-1, Ex. 3 at 45), it is undisputed that
18  Waterfront sent the three duplicate originals even though, according to Waterfront, CMA never sent a
19  confirmation. In passing, Waterfront asserts that negotiations "possibly" continued into July 2007,
20  after the first version was sent. (Dkt. No. 31 at 2.) However, the only evidence Waterfront cites in
21  support is Isoard's response of "I don't know" to the question of whether negotiations had concluded
22  when he returned to France in July 2007. This uncertain answer standing alone does not create a
23  disputed issue of fact. Based on the undisputed facts, a reasonable trier of fact would be compelled to
24  find that the contract sent in triplicate was an offer by Waterfront.

25        **2.**    **CMA Accepted Waterfront's Offer**

26      No genuine issue of material fact exists as to whether CMA accepted Waterfront's offer to
27  enter the first version of Lease 7006. Although the Court accepts as true Waterfront's evidence that
28  CMA never provided it either oral or written acceptance to the first version, it is undisputed that CMA

continued to possess and use the containers after receiving the offer of the first version in triplicate. As noted above, the UCC allows for a non-explicit acceptance of a lease agreement: "[u]nless otherwise unambiguously indicated by the language or circumstances, an offer to make a lease contract must be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Cal. Com. Code § 10206(a). CMA's continued possession of the containers following its receipt of a written offer that memorialized the agreement reached orally, coupled with the lack of any further negotiations, constitutes an acceptance "in any manner and by any medium reasonable in the circumstances."

Waterfront's assertion that there is at least a dispute of fact as to whether acceptance was conditioned upon CMA returning a signed copy of the contract to Waterfront is unpersuasive. In support of its argument, it relies on the deposition testimony of Hu and Hema Kumar, Waterfront's Vice President of Legal & Corporate Affairs. Kumar merely testified to his own belief that there is no binding agreement until the contract is signed by the client. (Dkt. No. 31-4 at 55-56.) And Hu testified only that it was Waterfront' practice to send the final version in triplicate to the client and then once the signed version was returned from the client, to countersign the agreement and return a copy of the fully executed agreement to the client. (Dkt. No. 31-4 at 41.) Although pressed at oral argument to identify evidence that the parties understood that acceptance required a signature, Waterfront could identify no such evidence beyond its uncommunicated, subjective belief that a signature was required to create an enforceable agreement.

Indeed, Waterfront's theory of this case directly conflicts with such an argument. Specifically, Waterfront argues that the second version with the default provision—"which CMA did not expressly accept or reject either," (Dkt. No. 31 at 7)—*was* accepted through performance despite the lack of a signature. Again, Waterfront cannot have it both ways: it cannot on the one hand contend that performance *is* a reasonable form of acceptance for the second version, and on the other hand contend that performance *is not* a reasonable form of acceptance for the first version. The only difference between the versions is the addition of the one-sentence default provision; both the first version and the second version, eventually, were given to CMA in hardcopy, in triplicate (Lessor/Lessee/Office), on corporate logo bond stationary. Further, Waterfront does not distinguish between CMA's

performance after receiving the first version of Lease 7006 and CMA's performance after receiving the second version. Under questioning at oral argument, Waterfront maintained that while the second version could be, and in fact was, accepted without a signature and through performance, the first version could be accepted only through a signature. As just explained, such a position is not supported by any evidence, except Waterfront's after-the-fact assertion that its subjective intent was to impose such differing acceptance requirements.

Waterfront further argues that the second version trumps the first because "by far the longest performance occurred after the [second version] was delivered to CMA in late 2007." (Dkt. No. 31 at 9.) Not only does Waterfront fail to provide any legal authority for its position, it ignores that the first version was *already* accepted when it sent the second version months later.

Waterfront also contends that an unsolicited 2009 email sent from Waterfront to CMA, which directs CMA's attention to the default provision and to which CMA never responded, is evidence that CMA did not accept the first version of Lease 7006. The Court is not persuaded. As explained above, CMA accepted the first version through performance under the lease; CMA's failure to respond to Waterfront's unsolicited statement regarding the governing terms of their lease does not extinguish CMA's acceptance two years earlier.

Although Waterfront does not argue that the second version merely modified the first version, any such attempted modification was ineffective. Paragraph 16 of Lease 7006's Terms and Conditions provides that "[a]ny change or modification to this Agreement must be in writing and signed by the parties hereto." (*See* Dkt. No. 25-2, Ex. 5.) The unambiguous requirement that the modification be signed in order to be accepted was never fulfilled. Further, even if Lease 7006 was not so unambiguous, "[f]or a party's performance to establish assent to a modification or addition of terms, the performance must be related to the proposed modification or addition and differ from the performance already required of the party by the existing contract." *C9 Ventures v. SVC-West, L.P.*, 202 Cal. App. 4th 1483, 1502 (2012). Waterfront has not identified any change of performance related to the default provision that would support an inference that CMA accepted that modification.

Waterfront's failure to recognize that the first version was accepted before the second version was offered also defeats its argument that the common law "last shot" rule should apply to the

1  "interpretation of arguably conflicting lease terms when no agreement was signed." (Dkt. No. 31 at
2  8.) Even if Waterfront's proposed "variation" on the last shot rule were valid, the second version was
3  not "an amended offer" because the original offer had already been accepted. (*Id.* at 9.)

4  Finally, while a lease contract is not enforceable unless there is a writing signed by the party
5  against whom enforcement is sought, *see* Cal. Com. Code § 10201(a)(2), the exception contained in
6  Subsection (d)(3) applies in this case since the containers were received and accepted by CMA.
7  Waterfront does not argue to the contrary.

### B. In the Alternative, the Parties Entered into an Oral Contract

Even if the first version of Lease 7006 is not a written contract, as a matter of law CMA and Waterfront entered into an oral contract with its terms reflected in the first version of Lease 7006. As noted above, a personal property lease may be made "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a lease contract." Cal. Com. Code § 10204(a). Further, "[a]n agreement sufficient to constitute a lease contract may be found although the moment of its making is undetermined." *Id.* at § 10204(b).

It is undisputed that the parties commenced negotiation on new lease contracts, include Lease 7006, on April 17, 2007 and that those negotiations produced a draft agreement that was emailed to CMA on May 5, 2007. It is also undisputed that sometime on or before June 7, 2007 Waterfront sent CMA the same version of Lease 7006, but in triplicate and on corporate logo bond stationary. Waterfront concedes that the per diem rates and "other essential lease terms" contained in this first version of Lease 7006 are "undisputed terms of Lease 7006" and therefore "enforceable." (Dkt. No. 31 at 7.) Although Waterfront argues that the purchase option was never agreed to, no evidence in the record supports that argument.

In fact, the record establishes the exact opposite—that the parties agreed to the purchase option. Specifically, Scott Hu testified that the purchase option provision was requested by Isoard:

Q: Who initiated the idea or the concept of a purchase option?

A: CMA. Bernard [Isoard] requested it.

Q: Eventually also prices for the purchase option made their way into at least a draft. Were those negotiated, those prices?

10

A: Yes.

Q: Between whom?

A: Between Bernard and myself.

(Dkt. No. 25-1, Ex. 1 at 27:4-12.) The provision and the purchase prices were negotiated sometime between April 17, 2007 and the emailing of the May 5 draft, which includes the same purchase option provision that is contained in the subsequently sent hardcopies. Hu further testified that the first version sent in triplicate was "the final contract." (Dkt. No. 34 p. 3-4, 57:25-58:5.)

In sum, CMA requested, and the parties negotiated, a purchase option provision, which was subsequently included in what Waterfront's negotiator testified was "the final contract"—a final contract that also included per diem rates and other essential terms that Waterfront admits they agreed to at or around that time. Waterfront's sending of the final contract is conduct "which recognizes the existence of a lease contract." Cal. Com. Code § 10204(a). Although the moment of its making is perhaps undetermined, the final contract with CMA's requested purchase option nonetheless establishes, as a matter of law, that the purchase option—as with the other terms in that contract— was negotiated, offered and accepted, and therefore enforceable as an oral contract. *See id.* at § 10204(b). And, as Waterfront has acknowledged, the statute of frauds is not a bar to enforcement of this oral agreement. *See id.* at § 10201(d)(3).

**C. Waterfront's Right to Terminate Lease 7006 Upon Default Does Not Void the Purchase Option**

Although not entirely clear, Waterfront appears to contend that, even if the first version of Lease 7006 controls, Paragraph 14 of the Terms and Conditions of Lease 7006 automatically voided the purchase option provision upon CMA's failure to make timely lease payments beginning in June 2007. Waterfront asserts that, at the very least, the exact import of Paragraph 14 requires "factual findings about the intent of the parties." (Dkt. No. 31 at 9.) Waterfront is incorrect on both points.

Paragraph 14 of the Terms and Conditions of Lease 7006 provides in relevant part:

> In the event that Lessee fails to perform any of its obligations under the Agreement . . . Lessee shall thereupon be and become in default under this Agreement, thereby vesting in Lessor the absolute and unqualified right to terminate this Agreement by

11

written notice to Lessee and to enter upon the premises where all the units of Equipment are located and retake and retain such units free of all rights of the Lessee, without any further liability or obligations to deliver the same to Lessee . . . .

(*See* Dkt. No. 25-2, Ex. 5.)  This provision unambiguously provides Waterfront the *right* to terminate Lease 7006 if CMA goes into default; however, it does not follow that this right, once vested, automatically terminates the purchase option provision.  Waterfront identifies no language in Lease 7006 that would suggest otherwise, and silence does not equate to an ambiguity.  Waterfront's bald assertion that the true meaning of Paragraph 14 requires an examination of the intent of the parties is unpersuasive in the absence of any ambiguous contractual language.  Because Paragraph 14 contains no ambiguity in regards to whether a default automatically voids the purchase option provision, summary judgment is appropriate.  *See Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981) ("In contract cases, summary judgment is appropriate only if the contract or contract provision in question is unambiguous.").

### D.     Waterfront Breached the Purchase Option Provision

As noted above, the purchase option provision in the controlling version of Lease 7006 provides as follows:

> Lessee is granted a Purchase Option provided that Equipment remains continuously under lease for a minimum period of Five (5) years and subject to the limitation that the sale will be for the totality of the units under lease at the time of the conclusion of the agreed lease period.  Unit purchase price shall be as follows.
>
> [unit prices]
>
> Lessee shall notify Lessor of intent to exercise the Purchase Option by Sixty (60) day written notice.  Lessor shall issue an invoice for the amount due and Lessee shall pay such invoice before the conclusion date of the lease period as set forth in the Recitals above.  Title shall pass to Lessee following receipt of Purchase Option price and per diem rates up to and including the last day of the agreed lease period.

(Dkt. No. 25-1, Ex. 5 ¶ 2.)  It is undisputed that On January 30, 2012—more than three months before Waterfront sent its termination notice—CMA sent Waterfront a "Purchase Option Notice," which provided in relevant part: "We hereby confirm that we envisage to exercise the purchase option for [Lease 7006]."  (Dkt. No. 25-2, Ex. 10.)  Waterfront does not dispute that this notice constitutes a notice "of intent to exercise the Purchase Option by Sixty (60) day written notice." (Dkt. No. 25-1, Ex. 5 ¶ 2.)  Nor does Waterfront dispute that it failed to "issue an invoice for the amount due." (*Id.*)

12

Given this absence of a genuine issue of material fact, the Court accordingly concludes that Waterfront breached the purchase option when it failed to perform its promise to issue an invoice upon CMA's notification of its intent to exercise the option.

Waterfront's arguments to the contrary are unavailing. Waterfront contends that CMA's January 30 notice alone does not constitute a valid exercise of the purchase option, and that the option expired upon CMA's failure to pay the invoice amount and the per diem rates prior to Waterfront's May 8, 2012 termination of Lease 7006. These arguments, however, conflict with the option's unambiguous language. Payment of the purchase price and the per diem rates are not conditions precedent to Waterfront's duty to issue an invoice for the amount due; rather, they are conditions subsequent. Not only is the sequence of the parties' obligations plainly set out in the option, common sense provides that CMA could not "pay such invoice" if Waterfront never provided such invoice. Further, while the failure to pay "per diem rates up to and including the last day of the agreed lease period" may arguably prevent passage of title, Waterfront's duty to provide an invoice is not conditioned on CMA's payment of per diem fees.[5]

## CONCLUSION

For the reasons stated above, CMA's motion is GRANTED. The parties shall appear for a case management conference at 1:30 p.m. on October 31, 2013.

**IT IS SO ORDERED.**

Dated: October 15, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

---

[5] Because the Court concludes that CMA's duties to pay the invoice amount and the per diem rates are not conditions precedent to Waterfront's duty to provide the invoice, the Court need not address the parties' arguments regarding whether Lease 7006 automatically terminated on April 30, 2012, prior to Waterfront's May 8, 2012 exercise of the termination provision.