1    Emard Danoff Port Tamulski & Walovich LLP
     Eric Danoff (60915)
2    Katharine Essick (219426)
     49 Stevenson Street, Suite 400
3    San Francisco, CA  94105
     Telephone:     (415) 227-9455
4    Facsimile:     (415) 227-4255
     E-Mail:        edanoff@edptlaw.com
5    E-Mail:        kessick@edptlaw.com

6    Attorneys for Defendant and Counterclaimant
     Waterfront Container Leasing Co., Inc.
7

8

9                        UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12   CMA CGM, S.A.,                          Case No.:  C-12-05467-JSC

13              Plaintiff,                   **TRIAL BRIEF BY DEFENDANT AND
                                             COUNTERCLAIMANT
14        vs.                                WATERFRONT CONTAINER
                                             LEASING COMPANY**
15   WATERFRONT CONTAINER LEASING
     COMPANY, INC.,                          Trial Date: June 23, 2014
16                                           Court: Magistrate Judge Jacqueline Corley
                Defendants.
17

18   AND RELATED COUNTERCLAIM

19

20        Waterfront Container Leasing Co. ("Waterfront") submits its Trial Brief.

21   Dated:  May 22, 2014          EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
                                   Eric Danoff
22                                 Katharine Essick

23                                 By_____/s/ Eric Danoff_____
                                   Attorneys for Defendant and Counterclaimant
24                                 Waterfront Container Leasing Co., Inc.

25

26

27

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

1

## TABLE OF CONTENTS

2    Issues Presented.................................................................................................................... 1

3    I.    Statement of Facts. ..................................................................................................... 2

4          A.    The Lease Agreements. ..................................................................................... 2

5          B.    Events Following the Termination of the Leases................................................ 3

6          C.    The Court's Rulings on Motions. ...................................................................... 3

7    II.   CMA owes Waterfront damages under Lease 5004 and Lease 7006 ............................ 4

8          A.    CMA owes Waterfront $208,193 for charges under Lease 5004........................ 4

9          B.    CMA owes Waterfront $2,808,799 for charges under Lease 7006..................... 4

10   III.  Waterfront owes CMA damages for the difference between the market prices
           of the containers and the purchase option prices ......................................................... 5
11
           A.    If market value is determined by sale of the containers on the open
12               market, Waterfront owes CMA $1,349,546 ...................................................... 7

13         B.    If market price is determined as of May 2012, then the price should be based on
                 the CMA/TAL sale/leaseback, appropriately adjusted, and Waterfront owes CMA
14               $1,914,966. ...................................................................................................... 9

15               1.    For a sale/leaseback in May 2012 the difference between the fair market
                       sales prices and the purchase options prices totals $3,494,256................ 9
16
                 2.    CMA owes Waterfront $1,579,290 for failure to timely return
17                     the containers.......................................................................................... 11

18   IV.   Summary of Damages Calculations .......................................................................... 15

19   Appendix A–Relevant Lease Terms

20   Exhibit S--Damages Tables (Sale of Containers on Open Market)

21   Exhibit T–Damages Tables (Sale/Leaseback)

22

23

24

25

26

27

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- i -

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Allied Canners & Packers v. Victor Packing Co.*
(1984) 162 Cal. App. 3d 905, 209 Cal. Rptr. 60 ...................................................... 9

4

*Brower v. Rohweder*
5      (Bankr. D.N.D. 1988) 104 B.R. 226 ............................................................... 8

6      *Burlesci v. Peterson*
(1998) 68 Cal. App. 4th 1062, 80 Cal. Rptr. 2d 704 ..................................... 13

7

*Edwards v. Jenkins*
8      (1932) 214 Cal. 713, 7 P.2d 702 ............................................................. 13, 14

9      *Enterprise Leasing Corp. v. Shugart*
(1991) 231 Cal. App. 737, 282 Cal. Rptr. 620 ......................................... 13, 14

10

*Gruber v. Pac. States Sav. & Loan Co.*
11      (1939) 13 Cal. 2d 144, 88 P.2d 137 ........................................................... 13

12      *H-W-H Cattle Co. v. Schroeder*
(8th Cir. 1985) 767 F.2d 437 ..................................................................... 9

13

*In re Excello Press, Inc.*
14      (7th Cir. 1989) 890 F.2d 896 ..................................................................... 8

15      *Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan*
(2005) 129 Cal. App. 4th 692, 28 Cal. Rptr. 3d 815 ..................................... 13

16

*Los Angeles Federal Credit Union v. Madatyan*
17      (2012) 209 Cal. App. 4th 1383, 147 Cal. Rptr. 768 ..................................... 13

18      *Messerall v. Fulwider*
(1988) 199 Cal. App. 3d 1324, 245 Cal Rptr. 548 ....................................... 14

19

*Poggi v. Scott*
20      (1914) 167 Cal. 372, 139 P. 815 ............................................................... 13

21      *Schroeder v. Auto Driveaway Co.*
(1974) 11 Cal. 3d 908, 523 P.2d 662 ......................................................... 14

22

*Tyrone Pacific International v. MV Eurychili*
23      (9th Cir. 1981) 658 F.2d 664 ..................................................................... 14

24      *UAW v. NLRB* (D.C. Cir. 1972) 459 F.2d 1329.................................................10

25

## STATUTES AND RULES

26

California Civil Code

27

§3336 ............................................................................................... 14

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- ii -

California Commercial Code

Division 2 ........................................................................................................... 5

Division 10 ......................................................................................................... 5

§1305(a) ......................................................................................................... 6, 9

§2713 ........................................................................................................ 5, 6, 7

§2723 ................................................................................................................ 6

§10201(d)(3)……………………………………………………………………12

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

1

**Issues Presented**

2        The issues for trial are a determination of the amount of damages that CMA CGM, S.A.

3   ("CMA") owes to Waterfront, and the amount of damages that Waterfront owes to CMA.

4        CMA owes damages to Waterfront under Leases 5004 and 7006 for contractual rental

5   and other charges due.

6        Waterfront owes damages to CMA for failure to consummate the Lease 7006 purchase

7   option.  Under the California Commercial Code those damages are to put the parties in the same

8   financial position as if the breach had not occurred.  Under some circumstances that is measured

9   by the difference between the "market price" of the goods and the contract price at the time of

10  the breach.  In this case damages should be based on the difference between the market price of

11  the containers and the purchase option prices.  When the purchase option was to take effect at the

12  end of the lease on April 30, 2012, the containers were in use, scattered all over the world, and

13  unavailable for sale.  Waterfront submits that the market price should be determined when the

14  containers were redelivered and sold, because only then could CMA have sold them if the

15  purchase option had been consummated.  Waterfront also submits that the best evidence of

16  market price is the actual sales prices obtained, not the theoretical prices CMA argues for.

17  Waterfront's Exhibit S, attached, sets forth the damages calculations under that scenario.

18       CMA argues that the market price should be determined as of May 2012, even though the

19  containers were not available for sale on the open market then.  If the Court agrees that the price

20  in May 2012 governs, then that price should be based on the sale/leaseback transaction that

21  CMA entered into with TAL in March 2012, because CMA was going to include the Waterfront

22  containers in that sale/leaseback if the purchase option had been concluded.  The sale prices in

23  that sale/leaseback transaction have to be adjusted, however, because they were artificially high.

24  In addition, under any scenario using market prices in May 2012 Waterfront is entitled to

25  damages from CMA's failure to return the containers when due by October 31, 2012, because

26  the delayed return during a falling market for used containers damaged Waterfront.  Waterfront's

27  Exhibit T, attached, sets forth the damages calculations under that scenario.

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 1 -

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1    **I.      Statement of Facts.**

2           **A.      The Lease Agreements.**

3           Waterfront is a California corporation based in San Francisco and is in the business of

4    leasing out intermodal cargo containers.  CMA is a large French corporation based in Marseille

5    that operates oceangoing ships that carry cargo, and for that purpose CMA both owns and leases

6    in intermodal cargo containers.

7           Before 2007 Waterfront had leased thousands of containers to a company called Cheng

8    Lie Navigation, which was based in Taiwan.  CMA acquired Cheng Lie in about March 2007

9    and thereby assumed the leases and took possession of the containers.  Shortly thereafter

10   Waterfront and CMA renegotiated and consolidated some of the container lease agreements that

11   Waterfront had with Cheng Lie.  One of the renegotiated leases was for 7,271 containers under

12   Term Lease Agreement No. T07006SF ("Lease 7006").  The term of Lease 7006 was for a

13   minimum of five years beginning May 1, 2007.  (Lease 7006, typed Clause 6.  Appendix A,

14   which is attached, sets forth the key lease terms to which this Trial Brief refers.)  CMA also

15   became the successor lessee under Long Term Lease Agreement No. T05004SF ("Lease 5004"),

16   and that lease was not renegotiated.

17          Lease 7006 contains an option for CMA to purchase the containers at the end of the lease

18   for specified prices: $750 for a 20' container; $1200 for a 40' container; and $1300 for a 40' foot

19   high cube ("40HC") container.  (Lease 7006, typed Clause 2.)  Although notice of intent to

20   exercise the purchase option had to be given at least 60 days before the end of the lease term on

21   April 30, 2012, the actual sale would take place on that date, assuming that CMA had paid the

22   purchase option price and all rental charges then due.  (Lease 7006, typed Clause 2.)

23          Lease 5004 does not contain a purchase option.

24          Both Leases state that California state law governs.  (Lease 7006, typed Clause 27 and

25   printed Clause 16(e); Lease 5004, printed Clause 16(e).)

26          On January 30, 2012, CMA wrote Waterfront stating that it intended to exercise the

27   purchase option under Lease 7006.  The next day Waterfront responded that the purchase option

28   was void because CMA had been in default and continued to be in default under Lease 7006 for

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

failure to pay the rental (per diem) charges and other amounts owed.  From the first invoice to CMA in 2007 and continuously thereafter to the present CMA has been in arrears for the amounts due under Lease 7006 for rental and other charges.

Lease 7006 ended on April 30, 2012.  Waterfront gave formal notice to CMA on May 8, 2012, that CMA was in default of Lease 7006, Lease 5004, and all other leases, which therefore were terminated, subject to Waterfront's rights and remedies under the leases, and Waterfront demanded return of the containers.

**B.     Events Following the Termination of the Leases.**

In an attempt to resolve the dispute about the validity or not of the purchase option in Lease 7006, CMA and Waterfront attended a private mediation at JAMS in San Francisco before former Magistrate Judge Wayne Brazil on July 20, 2012.  The mediation failed to resolve the dispute.  At the conclusion of the mediation CMA (through Alexis Michel, the CMA Vice President in charge of container leases) and Waterfront signed the following agreement: "While the parties did not reach an agreement on which they could settle their dispute, CMA has agreed, in response to Waterfront's demand, to return the leased containers as soon as reasonably practicable to do so, and CMA will begin this process by Monday, July 23, 2012."

CMA sporadically returned 4,590 of the containers under Lease 7006 from August 2012 until January 2014.  Waterfront sold those containers as and where CMA returned them.  CMA has admitted that Waterfront received fair market prices for the containers CMA had redelivered.

As of February 19, 2014, CMA retained 2,590 containers, which (pursuant to the Court's Order) Waterfront invoiced to CMA at the purchase option prices.  CMA paid the purchase option prices, totaling $2,509,550, for those containers on February 27, 2014.  CMA did not pay Waterfront the purchase price for any containers that CMA returned.

**C.     The Court's Rulings on Motions.**

The parties submitted several motions for partial summary judgment.  On May 31, 2013, the Court issued its Order (Dkt. No. 19) ruling that under Lease 7006 CMA is required to pay Waterfront rental fees until the containers are returned notwithstanding the dispute over the purchase option.  (Dkt. No. 19 at 4:1-5; 5:21-22.)  The Court concluded that CMA's exercise of

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1   the purchase option would not have extinguished the lease agreement and the lessor-lessee

2   relationship between the parties, but would merely have created a separate bilateral sale contract,

3   with Waterfront as vendor and CMA as vendee.  (*Id*., at 5:17-20).   On October 15, 2013, the

4   Court issued its Order (Dkt. No. 35) ruling that CMA had a valid purchase option under Lease

5   7006 and that Waterfront breached that option by not issuing an invoice to CMA for the exercise

6   of it.  On December 13, 2013, the Court issued its Order (Dkt. No. 50) ruling that: (a) for the

7   containers CMA had failed to return under Lease 7006 as of that date Waterfront was entitled to

8   the purchase option prices rather than the Fixed Replacement Charges; (b) for the containers

9   CMA had failed to return under Lease 7006 as of that date CMA was entitled to retain them in

10  return for payment of the purchase option prices (rather than be required to return them to

11  Waterfront); and (c) Waterfront was entitled to certain prejudgment interest.

12  **II.     CMA owes Waterfront damages under Lease 5004 and Lease 7006.**

13           **A.     CMA owes Waterfront $208,193 for lease charges under Lease 5004.**

14           The damages CMA owes to Waterfront under Lease 5004 are straightforward because

15  that lease contained no purchase option and CMA has not asserted that Waterfront violated that

16  lease.  Under Lease 5004 CMA owes contractual rental, drop-off, handling, repair, and total loss

17  charges, plus interest.  The amounts for these total $208,193.  (See Exhibit S, page 2, attached.)

18           **B.     CMA owes Waterfront $2,808,799 for charges under Lease 7006.**

19           Under Lease 7006 CMA owes rental and repair charges.  Waterfront billed CMA the

20  rental for each container until CMA returned it, and billed the rental for the unreturned

21  containers until CMA paid the purchase option prices on February 27, 2014.  CMA used the

22  containers during these periods, without paying the purchase option prices.

23           Under the lease CMA also owes repair charges for the containers it returned that were

24  damaged beyond normal wear and tear (typed Clauses 3 and 19).  These charges total $267,144,

25  including interest.  Waterfront did not repair the redelivered containers but sold them as is, and

26  the sale prices Waterfront obtained presumably reflected that damaged condition.  Thus

27  Waterfront has deleted the repair charges for the damages scenario (Exhibit S) in which CMA's

28  damages are based on those actual sales prices.  The repair charges should be included in all the

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 4 -

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

other damages scenarios (Exhibit T and the scenarios CMA proposes), however, because under those scenarios Waterfront, not CMA, bears the loss of lower sales prices due to the condition of the containers.

Waterfront has not charged CMA under Lease 7006 for drop-off or handling charges that normally are assessed upon redelivery; CMA could claim those charges back as damages for breach of the purchase option, so those items would be a wash.

CMA owes damages for 11 total loss containers at the contractual Fixed Replacement Charge.  These are for containers that CMA had declared were total losses but which CMA did not pay for.  This item is not for containers that CMA failed to return following termination of the lease due to the purchase option dispute.

CMA has not paid the rental or other charges billed, and by contract CMA owes interest on that.  Waterfront has charged interest at the Lease 7006 contract rate on these unpaid amounts.  (Lease 7006, typed Clause 16, printed Clause 10.)

The amount for these charges totals $2,808,799 including repair charges, as set forth in Exhibit T at p. 3, and totals $2,541,655 excluding repair charges, as set forth in Exhibit S at p. 3.

**III.    Waterfront owes CMA damages for the difference between the market prices of the containers and the purchase option prices.**

CMA did not buy containers to replace the ones that Waterfront failed to sell to it under the purchase option, that is, CMA did not "cover."  Instead CMA continued to use the Waterfront containers after the termination of the lease on April 30, 2012.  CMA sporadically returned containers to Waterfront, primarily over the period August 2012 through January 2014.  By the end of January 2014 CMA had redelivered 4,590 containers to Waterfront.  In February 2014 Waterfront sold the remaining 2,590 containers still in CMA's possession to CMA at the purchase option prices.

Waterfront assumes that the Court will apply California Commercial Code ("CUCC") Division 2 (Sales) to the issue of CMA's damages.  CUCC Division 10, concerning leases, may be more applicable, and Division 10 does not have an equivalent to CUCC §2713, so common law contractual damages rules would apply.  Because the Court applied CUCC Division 2 in its

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1   Order dated December 13, 2013, however, Waterfront addresses that law here.

2         CUCC §2713 calls for damages to CMA in the amount of the difference between the

3   "market price" of the containers and the contract price at the time of the breach.  CUCC §2713

4   must, of course, be interpreted in accordance with other relevant provisions of the Commercial

5   Code.  CUCC §2723 states that if evidence of market price at the time of the breach is not

6   "readily available," the price prevailing within a reasonable time before or after the breach may

7   be used.  CUCC §1305(a) states that the overriding principle of damages under the CUCC is that

8   the damaged party should be put into as good a financial position as it would have been if the

9   breach had not occurred.

10        In the usual case decided under §2713 the seller fails to deliver the goods.  The present

11  case is unusual because CMA had the containers in its possession at the time of the breach, and

12  they were not available for resale because they were in use and scattered all over the world.

13  There is no generally accepted index of sale prices for used containers or other "readily

14  available" pricing guide.  Waterfront has found no precedent applying §2713 to a case like this

15  one.  What "market price" means under these circumstances, and when and how it should be

16  measured, is an open question.

17        The parties agree that the market prices of the containers exceeded the purchase option

18  prices as of May 2012 and thereafter.  Waterfront submits that the proper measure of damages is

19  what CMA could have sold the containers for on the open market if the purchase option had been

20  concluded.   In that way CMA would be put in as good a position as if the breach had not

21  occurred.  The best evidence of when those sales would take place and for how much is the

22  history of when those sales did take place and for how much, that is, when CMA no longer

23  needed to use the containers and redelivered them to Waterfront, which promptly sold them for

24  fair market value.  That is described in Section A below.

25        CMA argues that the market price should be measured at the time of the breach.  If the

26  Court agrees, then the market price should be measured by the sale/leaseback prices from TAL,

27  adjusted to fair market value, because CMA was planning to include the Waterfront containers in

28  the sale/leaseback transaction with TAL made in March 2012.  This is described in Section B

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

below.

**A.**     **If market value is determined by sale of the containers on the open market, Waterfront owes CMA $1,349,546.**

Because at the end of the lease on April 30, 2012, the containers were in use and were scattered all over the world, they had no realistic sale value on the open market.  No one would buy them under those circumstances (except possibly at a huge discount) because CMA could not say when or where they would be available to the buyer, and the buyer would have no opportunity to inspect their condition.

If CMA had been allowed to exercise the purchase option, CMA presumably would have done what it in fact did: use the containers as needed, and then when not needed make them available for sale on the open market.  Alexis Michel, CMA's Vice President in charge of its container fleet, testified that after July 2012 CMA had a standing instruction to its agents around the world that when a Waterfront container was free (not in use) and in a location where Waterfront had a depot, CMA should redeliver it.  Otherwise CMA used the containers in its normal operations.  Waterfront in turn sold the redelivered containers on average about two months after CMA redelivered them.

The price of used containers varies based on several factors: the size of the container, type of the container, location of the container, condition of the container, age of the container, the sales terms (warranted as to condition or "as is"), the volume of containers sold (large volumes are generally sold at a volume discount), and most importantly the supply and demand of the local market when and where the container is sold.  All the witnesses agree on this.  CMA has admitted that Waterfront sold the containers for fair market values after CMA redelivered them.  Indeed, Waterfront sold its own containers along with the ones that CMA returned, so Waterfront had every incentive to obtain the best possible prices.  Thus the best evidence of what CMA could have sold the containers for is what Waterfront in fact sold them for.

Waterfront expects CMA to argue that under CUCC §2713 the May 2012 market prices of used containers in general should apply, but no case under §2713 applies general market prices to circumstances like these.  The price that counts in this case is the market price of these

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

particular containers, not some abstract containers in other locations, in different condition, or sold under different sales terms.  The market price of a 2010 Chevrolet Impala sitting in a showroom in San Francisco in May 2012 differs from the market price of a 2010 Chevrolet Impala en route from Djibouti to Mombasa in January 2014.  It may be the same make of car, but its location, availability, condition, and the local sales market drive the price.  CMA is not entitled to the value of generic containers but to the value of the actual containers subject to the purchase option.  CMA could not have sold those containers until they were available for sale, which presumably was when and where CMA returned them to Waterfront.

CMA has admitted in discovery that Waterfront obtained fair market value prices when selling the containers CMA redelivered.  That is the best evidence of the market value of those containers since the prices reflect the value of each container in its actual condition in its actual location in the actual market at the time when it was available for sale.  In determining fair market value in a different context, establishing the amount of a deficiency under the Uniform Commercial Code following the sale of secured property, one court noted the compelling evidentiary effect of a commercially reasonable sale: "If despite the lack of notice the sale was commercially reasonable, the price is more than merely informative.  The product of a commercially reasonable sale *is* the fair market value…The price obtained in a commercially reasonable sale is not *evidence* of the market value, which can be discounted or thrown out.  It *is* the market value."  (Italics in original.)  *In re Excello Press, Inc.* (7th Cir. 1989) 890 F.2d 896, 904-905.  See also *Brower v. Rohweder* (Bankr. D.N.D. 1988) 104 B.R. 226, 229 (actual price received is the best evidence of market price).

The prices Waterfront received for the containers CMA returned, and the difference between those prices and the purchase option prices, are shown in Exhibit S, p. 4.  The differential between the actual sale prices and the purchase option prices totals $1,349,546.  That is the proper measure of CMA's damages.

///

///

///

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

B.     **If market price is determined as of May 2012, then the price should be based on the CMA/TAL sale/leaseback, appropriately adjusted, and Waterfront owes CMA $1,914,966.**

1.     **For a sale/leaseback in May 2012 the difference between the fair market sales prices and the purchase option prices totals $3,494,256.**

Under the circumstances of this case the best measure of damages is what the containers actually sold for as they became available for sale.  If the Court applies a measure of damages based on assumed market prices as of May 2012, however, then those damages should be based on the CMA/TAL sale/leaseback transaction.  Because the sales prices in that transaction appear to be inflated, however, they should be adjusted down to fair market value.

Under the Commercial Code, when a seller breaches by failing to deliver, and the buyer has entered into a resale contract for the goods, the buyer's damages are measured by the resale price.  In *Allied Canners & Packers v. Victor Packing Company* (1984) 162 Cal. App. 3d 905, 209 Cal. Rptr. 60, Allied had a contract to purchase raisins from Victor.  Allied in turn had contracts to sell the raisins to Japanese firms.  The difference in Allied's purchase price from Victor and its resale price abroad was $4,463.  Heavy rains damaged the raisin crop, and the price of raisins went up.  Victor defaulted, would not deliver the raisins to Allied, and conceded that it was in breach of contract.  Allied did not cover (buy substitute raisins) but sued Victor, claiming that it was entitled to damages in the amount of about $150,000, the difference between the contract price with Victor and the market price at the time of the breach.  The Court of Appeal had to decide whether Allied's remedy should be the market-contract formula loss of $150,000 or the prospective resale loss of $4,463.  The Court of Appeal analyzed the Commercial Code and concluded that §1305(a) [at that time numbered §1106(1)], which states that the aggrieved party should be put in as good a position as if the other party had performed, prevails over the market-contract formula stated in §2713(1), and that the award to the aggrieved buyer should be limited to the amount it would have made on the transaction, which for Allied was $4,463.  In *H-W-H Cattle Company v. Schroeder* (8th Cir. 1985) 767 F.2d 437 the court reached the same result under the Iowa UCC (identical in this respect to the CUCC), holding that the aggrieved buyer of cattle that were to be resold was entitled to the difference between its buying price and its selling price, not to the higher difference between its buying price and the

- 9 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

1  market price.

2        Michel testified that it was CMA's intention to sell all the Waterfront containers to a

3  lessee named TAL and then lease them all back from TAL.  This would have taken effect when

4  the Waterfront containers became property of CMA as of April 30, 2012.  CMA and TAL did

5  enter into a sale/leaseback for other containers in March 2012, and Michel testified that CMA

6  would have included the Waterfront containers in that deal at the same prices.  The prices in the

7  CMA/TAL sale/leaseback were: $1,360 for a 20' unit; $1,700 for a 40' unit; and $1,980 for a

8  40HC unit.  In its Initial Disclosure on 03/19/2013, which CMA never amended, CMA claimed

9  this was the fair market value of the containers for purposes of measuring damages.

10       Whether the sale prices to TAL were fair market prices, however, depends upon whether

11  the lease rates and other lease terms from TAL were at fair market value.  The sale prices and the

12  lease prices are related: the higher the sales prices, the higher the lease rates.  CMA has produced

13  the TAL/CMA container purchase agreement but, despite Waterfront's formal discovery

14  demands for the leaseback terms that accompanied the sale, CMA has refused to produce them.

15  CMA has asserted that it has business reasons not to disclose the leaseback terms, even though

16  the parties to this action entered into a confidentiality agreement that would protect against

17  disclosure of those terms for purposes unrelated to the lawsuit.  Because CMA has refused to

18  disclose the leaseback terms, CMA cannot prove and Waterfront cannot confirm that the sale

19  prices to TAL were at market value.  Moreover, the Court can infer from CMA's refusal to

20  disclose the leaseback terms that such evidence is unfavorable to CMA.  *UAW v. NLRB* (D.C.

21  Cir. 1972) 459 F.2d 1329, 1335-1339.

22       Indeed, the evidence is that the CMA/TAL sales prices were inflated and were above fair

23  market value.  A sale/leaseback can constitute a de facto loan.  Assume that a container has a fair

24  market value of $100, a fair market lease rate of $20 per year, and a residual value after 3 years

25  of $60.  If the buyer/lessor enters into a sale/leaseback for three years with the seller/lessee under

26  those terms, the buyer/lessor would earn a profit over the three years of $20 ($60 in rent plus the

27  residual value of $60 less the purchase price of $100).  But the parties could agree to a different

28  structure yielding the same profit: a selling price of $190 and a lease rate of $50 per year.  At the

- 10 -

end of the three years the buyer/lessor would have the same profit of $20 ($150 in rent plus the residual value of $60 less the purchase price of $190). In effect this would constitute a loan from the buyer/lessor to the seller/lessee, and sale/leasebacks sometimes serve this purpose. CMA's own expert (Roger Passal) in deposition called the TAL/CMA purchase price "artificial" in the absence of the leaseback terms.

The CMA/TAL sale prices indeed appear to be inflated. In 2012 CMA was in need of cash. Container finance expert Gary Sawka reviewed the data in the sale portion of the TAL/CMA agreement. He concluded that the sales prices were above fair market value. He explains this in detail in his report, which Waterfront will present at trial.

If the Court computes damages to CMA based on assumed market prices as of May 2012 (rather than the actual sale prices for the redelivered containers), then the Court should apply prices based on the CMA/TAL sale/leaseback in 2012 because CMA intended to include the Waterfront containers in that sale. Those sale prices were: $1,360 for a 20' unit; $1,700 for a 40' unit; and $1,980 for a 40HC unit. Those sale prices should be adjusted down, however, to take out the artificial inflation and bring the prices down to fair market value. Sawka computed the fair market prices in the sale/leaseback to be $1,230 for a 20' unit; $1,551 for a 40' unit; and $1,888 for a 40HC unit. Using those figures the difference between the market prices and the purchase option prices would total $3,494,256. (See Exhibit T, p. 4.)

Even this figure is too high. CMA's expert Roger Passal admitted that in February 2014, when Waterfront sold to CMA at purchase option prices the 2,590 containers CMA still held, the value of those containers still exceeded the purchase option prices. To give CMA the differential between market price and purchase option price in May 2012 and then again in February 2014 for those 2,590 containers would constitute a double recovery. Waterfront will revise this figure when it can determine what, according to Passal, the fair market prices were in February 2014.

**2.      CMA owes Waterfront $1,579,290 for failure to timely return the containers.**

Waterfront is entitled to damages for CMA's failure to return the containers in the time required by Lease 7006 and as CMA confirmed following the mediation. This is separate from

- 11 -

the issue of rental due.

Under Lease 7006 CMA was obligated to return all the containers within six months of the end of the Lease.  (Typed Clause 17.)  The Lease terminated on April 30, 2012, so CMA was obligated to redeliver all the containers by October 31, 2012.  CMA returned only 1,334 containers by that date.  CMA's failure to return the rest of the containers to Waterfront by that date constituted a breach of contract.

The Court has ruled that CMA's lease obligations continued even if Waterfront had breached the purchase option:  "…CMA's exercise of the purchase option would not have extinguished the lease agreement and the lessor-lessee relationship between the parties.  Rather, any such exercise would have merely created a separate bilateral contract between the parties, with Waterfront as vendor and CMA as vendee."  (Order, 05/31/13, Dkt. 19, at p. 5, italics in original.)  The other provisions in Lease 7006, including typed Clause 17, thus are contractually binding despite the dispute over the purchase option default term.  See also CUCC §10201(d)(3).

At the conclusion of the mediation on July 20, 2012, CMA confirmed its duty to return the containers promptly, when CMA and Waterfront signed the following agreement: "While the parties did not reach an agreement on which they could settle their dispute, CMA has agreed, in response to Waterfront's demand, to return the leased containers as soon as reasonably practicable to do so, and CMA will begin this process by Monday, July 23, 2012."

CMA's witnesses concede that it could have returned the containers within six months of the end of the Lease.  In deposition Michel testified that CMA could have returned the containers within six months if it had made a special effort, but that CMA made no special effort to return the Waterfront containers within the six months, and instead returned them at CMA's convenience when CMA no longer needed to use them and they happened to be in a location where Waterfront had a depot to receive them.  CMA's expert witness, Roger Passal, testified that CMA readily could have redelivered all the containers within six months of the end of the lease on April 30, 2012.

CMA's failure to return the containers not only constituted a breach of contract, it also constituted the tort of conversion.  A conversion occurs where the defendant wrongfully

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1    exercises dominion over the property of another.  *Gruber v. Pacific States Sav. & Loan Co.*

2    (1939) 13 Cal. 2d 144, 148, 88 P.2d 137; *Irving Nelkin & Co. v. South Beverly Hills Wilshire*

3    *Jewelry & Loan* (2005) 129 Cal. App. 4th 692, 699, 28 Cal. Rptr. 3d 815.  To establish

4    conversion a plaintiff must show his ownership or right to possess the property at the time of the

5    conversion, the defendant's disposition or conversion of the property by a wrongful act, and

6    damages.  *Burlesci v. Peterson* (1998) 68 Cal. App. 4th 1062, 1066, 80 Cal. Rptr. 2d 704.

7    Waterfront still owned the containers under Lease 7006 even if Waterfront was in default of the

8    purchase option.  (Order, May 31, 2013, Dkt. No. 19, at 5:3-9; Lease 7006, Typed Clause 2,

9    printed Clause 1.)

10        Conversion is a strict liability tort, and therefore the defendant's good faith, lack of

11   knowledge, and motive are immaterial.  *Burlesci v. Peterson, id.*  The tort rests upon a party's

12   interference with the owner's dominion over the property, and the interfering party's good faith

13   or intent is no defense.  *Id.*  "Because the tort of conversion is a species of strict liability,

14   defendant's good faith, ignorance, mistake or motive is irrelevant and does not constitute a

15   defense."  *Enterprise Leasing Corp. v. Shugart* (1991) 231 Cal. App. 737, 747-748, 282 Cal.

16   Rptr. 620; *Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal. App. 4th 1383, 1387-

17   8, 147 Cal. Rptr. 768.  The California Supreme Court in *Edwards v. Jenkins* (1932) 214 Cal. 713,

18   7 P.2d 702 approvingly quoted the following from *Poggi v. Scott* (1914) 167 Cal. 372, 139 P.

19   815: "The plaintiff's right of redress no longer depends upon his showing, in any way, that the

20   defendant did the act in question from wrongful motives, or generally speaking, even

21   intentionally; and hence the want of such motives, or of intention is no defense.  Nor, indeed, is

22   negligence any necessary part of the case."

23        The plaintiff can sue for damages for conversion caused by the delay in return of property

24   even though the defendant may have returned it before the trial.  *Enterprise Leasing Corp. v.*

25   *Shugart* (1991) 231 Cal. App. 737, 748, 282 Cal. Rptr. 620;  *Irving Nelkin & Co. v. South*

26   *Beverly Hills Wilshire Jewelry & Loan* (2005) 129 Cal. App. 4th 692, 699-700, 28 Cal. Rptr. 3d

27   815.  Nor is it a defense to conversion that the defendant claims that the plaintiff owes money to

28   the defendant.  *Gruber v. Pacific States Sav. & Loan Co.* (1939) 13 Cal. 2d 144, 148, 88 P.2d

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 13 -

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

137

Even though the defendant originally receives property lawfully, it has committed the tort of conversion if it fails to return the property when due or upon demand by a party entitled to possession. *Enterprise Leasing Corp. v. Shugart* (1991) 231 Cal. App. 737, 282 Cal. Rptr. 620; *Messerall v. Fulwider* (1988) 199 Cal. App. 3d 1324, 245 Cal Rptr. 548; see also *Schroeder v. Auto Driveaway Co*. (1974) 11 Cal. 3d 908, 918, 523 P.2d 662, quoting from Prosser's  Law of Torts: "Where B is in possession of the property, or where he has such control over it that he can readily get possession (as where he has stored it with a bailee), and A demands it, and B fails to deliver it, no modern court is going to save B from being a converter on the ground that there was only a nonfeasance."

In such cases the measure of damages for conversion is the difference between the value of the property when it should have been returned compared to the value of the property when it was returned.  In *Edwards v. Jenkins* (1932) 214 Cal. 713, 7 P.2d 702, the defendant stock brokers delayed in providing the share certificates to the plaintiff stock buyer, and during the delay the value of the stock decreased.  The California Supreme Court held that the broker owed the buyer the difference in market price between its value when it should have been delivered and its value when it was delivered.  See also *Tyrone Pacific International v. MV Eurychili* (9th Cir. 1981) 658 F.2d 664, 666-7 (construing Cal. Civil Code §3336, which sets forth the damages rule for conversion, to mean that where the owner has accepted return of the property, but its value has declined as a result of the conversion, he is entitled to the amount by which the value has declined).

The market price for used containers dropped substantially from 2012 to 2013, and then dropped further in 2014.  If CMA had returned the containers by October 31, 2012, Waterfront could have sold the containers by the end of 2012 at the higher prices then prevailing.  Instead CMA returned 3,256 containers after (often long after) October 31, 2012.  CMA's delay forced Waterfront to sell the containers at the substantially lower 2013 and 2014 prices than Waterfront could have obtained if CMA had returned the containers when due.  If CMA is held entitled to the differential between market prices and purchase option prices as of May 1, 2012, then

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1    Waterfront is entitled to offset that amount by the damages CMA caused Waterfront by not

2    returning the containers by October 31, 2012.

3         These damages have nothing to do with the age of the containers or CMA's use of them

4    until redelivery.  Waterfront obtained lower prices for the containers in 2013 and 2014 not

5    because the containers were a year older—the difference in price between a used 10 year old

6    container and a used 11 year old container is minimal—but because CMA's delay prevented

7    Waterfront from selling the containers at 2012 market prices and forced Waterfront to sell them

8    at the substantially decreased 2013-2014 market prices.

9         If CMA receives damages based on market prices as of May 1, 2012, allowing CMA to

10   return the containers late but not bear the financial consequences for that would be an injustice.

11   That would allow CMA to gamble at Waterfront's expense.  Failing to enforce the contractual

12   redelivery date would permit CMA to hold the containers beyond that date to see where the

13   market went.  If it went down, as it did in 2013, CMA could return the containers, claim the May

14   2012, prices, and force Waterfront to suffer the loss of having to sell the containers at the low

15   2013-2014 prices.  This is what happened.  If the market instead had gone up, CMA could have

16   kept the containers and deprived Waterfront of the benefit of the rising market.  The Court

17   should not sanction such an unfair result.

18        Waterfront sold the containers received from CMA on average within 55 days following

19   receipt.  If CMA had returned the containers by October 31, 2012, then Waterfront could have

20   sold the containers by the end of 2012, for the higher 2012 prices rather than the lower 2013-

21   2014 prices.  The difference is $1,579,290, as is detailed in Exhibit T, p. 5.  This amount should

22   be awarded to Waterfront to reduce the damages awarded to CMA if those damages are based on

23   May 2012 prices.  Exhibit T sets forth the proper amount of damages if awarded based on May

24   2012 market prices, and the net owing to Waterfront would be $1,102,026.

25   **IV.    Summary of Damages Calculations.**

26        The best evidence of the value of the Lease 7006 containers, when and where they

27   became available for sale, is the price they actually sold for.  Using those figures CMA owes

28   Waterfront a total of $1,400,302, as shown in Exhibit S.  If the Court applies May 2012 prices

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

1   instead, at the fair market value Sawka computed, CMA owes Waterfront a total of $1,102,026,

2   as shown in Exhibit T.  Even using the actual 2012 CMA/TAL sale leaseback prices, CMA

3   would owe Waterfront $223,042.  All these damages amounts are as of April 30, 2014.

4          Both parties breached Lease 7006, Waterfront by not fulfilling the purchase option, and

5   CMA by defaulting on per diem and other charges (before and after May 2012) and by failing to

6   redeliver the containers when due.  The purpose of the damages provisions in the California

7   Commercial Code and at law is to put the parties in the financial positions in which they would

8   have been had the breaches not occurred, not to grant windfalls to a nonbreaching party or to

9   punish a party who breached.  Waterfront's proposed damages figures would achieve those ends.

10  Conversely, CMA claims damages in amounts that would constitute a windfall to it and put it in

11  a better financial position than if the purchase option had been consummated.  Waterfront's

12  proposed damages figures should be adopted.

13  Dated:  May 22, 2014              EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
                                      Eric Danoff
14                                    Katharine Essick

15                                    By_____/s/ Eric Danoff_____
                                      Attorneys for Defendant and Counterclaimant
16                                    Waterfront Container Leasing Co., Inc.

17

18

19

20

21

22

23

24

25

26

27

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

**Appendix A – The Relevant Lease Terms**

**Lease 7006--Typed Terms.**

Clause 2 [partial].  Purchase Option.  "Title shall pass to Lessee following receipt of Purchase Option price and *per diem* rates up to and including the last day of the agreed lease period."

Clause 6.  Lease Period.  "The effective On-Hire Date shall be May 1st 2007 and shall run for a period of no less than Five years to April 30th 2012."

Clause 8.  Specifies the container rental (per diem) for each type of container.

Clause 16 [partial].  Non-Performance.  "In the event of non-performance in settlement of lease charges, Lessor shall have the right to terminate this Agreement by a Thirty (30) day written notice to Lessee, whereupon all outstanding charges payable under this Agreement become immediately payable…A late payment penalty of One and One Half Percent (1.5% per month shall be applied to all accounts outstanding after the due date."

Clause 17.  Build-Down Period.  "Six (6) months from the end of the agreed lease period."

Clause 18.  Redelivery.  "Lessee shall redeliver Equipment to Lessor's designated container yards with drop-off limitations as set forth in the DOL table attached."  The table at the end of Lease 7006 specifies to what depots the containers may be redelivered and in what quantities.

Clause 20 [partial].  Replacement Value in the Event of Loss or Total Damage.  "In the event of loss or constructive total loss of Equipment through damage during the lease period of this Agreement, Lessee shall pay Lessor a Fixed Replacement Charge as follows:

US$2,200.00 per unit of 20' Dry Cargo Container

US$3,520.00 per unit of 40' Dry Cargo Container.

US$3,740.00 per unit of 40' HC Dry Cargo Container."

Clause 27 [partial].  Governing Law.  "This Agreement shall be governed and construed in accordance with the laws of the State of California."

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

**Lease 7006--Printed Terms.**

Clause 1 [partial].  "All units of equipment shall remain at all times the property of Lessor."

Clause 10 [partial].  "Lessee shall pay the rental specified by this lease promptly after being invoiced.  In the event that Lessee does not make the aforementioned rental payments, Lessor may charge and Less shall pay interest at the rate of 1.5% per month or the maximum amount as may be permissible under applicable law on the unpaid rentals."

Clause 14 [partial].  "In the event that Lessee fails to perform any of its obligations under this Agreement or under any other agreement or if Lessee or any of its subsidiaries or affiliates shall fail to perform any of its obligations under any other agreement with Lessor or any of its subsidiaries or affiliates… Lessee shall thereupon be and become in default under this Agreement, thereby vesting in Lessor the absolute and unqualified right to terminate this Agreement by written notice to Lessee and to enter upon the premises where all units of the Equipment are located and retake and retain such units free of all rights of Lessee, without any further liability or obligations to deliver the same to Lessee and without releasing Lessee from Lessees obligation for the payment of all rental whether or not yet due for such units of the Equipment until all of the rentals reserved hereunder have been paid, provided, however, that nothing contained herein shall limit Lessee's obligation hereunder to return the Equipment."

Clause 16(e) [partial].  "This Agreement shall be interpreted under and governed by the laws of the State of California."

**Lease 5004--TypedTerms.**

Clause H [partial].  Build-Down Period.  "In the event that this Contract is not renegotiated prior to the expiration of the eighty-four (84) month lease period, Lessee shall redeliver the containers to the Lessor over a nine (9) month build down period upon expiration of the contract.  All terms and conditions of this Contract shall apply during this nine (9) month build down period."

Clause K [partial].  Damaged Equipment/Off-Hire Procedure.  "Any damage incurred while a container is on lease to the Lessee shall be for the account of Lessee; excluding normal

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

wear and tear…"

Clause L.  Replacement Value.  "In the event of loss or total damage, Lessee shall pay to the Lessor the Depreciated Replacement Value (DRV) of the unit.  The DRV of each unit is determined by depreciated the Replacement Value of US$3400 per 40' standard container at the rate of 6% per annum commencing from the date the Lessor first places the equipment on lease to the Lessee.  The DRV shall not be less than 60% of the aforementioned Replacement Value. Should Lessee elect to declare a unit as lost or as total loss, the lease rate shall continue to accrue until full payment of the DRV is received by the Lessor."

**Lease 5004--Printed Terms.**

Clause 10 [partial].  "Lessee shall pay the rental specified by this lease promptly after being invoiced.  In the event that Lessee does not make the aforementioned rental payments, Lessor may charge and Less shall pay interest at the rate of 1.5% per month or the maximum amount as may be permissible under applicable law on the unpaid rentals…In the event that charges are not paid or contested as herein provided, then, in addition to all other remedies reserved to Lessor hereunder and at law and in equity, Lessor may, but is not obligated to, pay the Charges and collect the same, plus interest at 1.5% per month, from Lessee.

Clause 16 (e) [partial].  "This Agreement shall be interpreted under and governed by the laws of the State of California."

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC