**COX, WOOTTON, LERNER,**
**GRIFFIN, HANSEN & POULOS, LLP**
Mitchell S. Griffin (SBN 114881)
Christopher S. Kieliger (SBN 209121)
mgriffin@cwghp.com
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

Attorneys for Plaintiff and
Counterdefendant CMA CGM, S.A.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CMA CGM, S.A.<br><br>　　　　Plaintiff,<br><br>v.<br><br>WATERFRONT CONTAINER LEASING COMPANY, INC.<br><br>　　　　Defendant.<br>——————————————<br>WATERFRONT CONTAINER LEASING COMPANY, INC.<br><br>　　　　Counterclaimant,<br><br>v.<br><br>CMA CGM, S.A.<br><br>　　　　Counterdefendant. | Case No.: **C 12 5467 JSC**<br><br>**CMA CGM, S.A.'s TRIAL BRIEF**<br><br>**TRIAL DATE: 6/23/14**<br><br>**TIME: 8:30 A.M.**<br>**15TH FLOOR, CTRM. F** |

# TABLE OF CONTENTS

I. OVERVIEW ...................................................................................................... 1

II. THE PRIMARY REASON FOR THE REMAINING DISPUTE .............. 2

III. THE PURELY LEGAL ISSUES .................................................................. 3

   A. CMA's Damages for the Returned Containers ....................................... 3
      1. Waterfront Hopes to Avoid the Plain Meaning of Section 2713 ......... 6
      2. Waterfront's Position is Contrary to Basic Contract Principles .......... 8
      3. CMA Could Have Sold the Containers ................................................ 9
   B. CMA's Damages for the Unreturned Containers ................................. 10
   C. The Legal Dispute Over Rental Charges ............................................... 11
   D. Waterfront is Not Entitled to Repair Costs ........................................... 13

IV. THE FACTUAL ISSUES FOR TRIAL ..................................................... 14

V. CMA'S DAMAGES CALCULATION ....................................................... 15

   A. CMA's Damages for the Returned Containers ..................................... 15
   B. CMA's Damages for the Purchased Containers ................................... 15

VI. CONCLUSION ............................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*
  (1994) 7 Cal.4th 503, 515 ..................................................................................................9
*KGM Harvesting Company v. Fresh Network*
  (1995) 36 Cal.App.4th 376 ......................................................................................8, 11, 16
*R.B. Matthews, Inc.. v. Transamerica Transportation Services, Inc.*
  (9th Cir. 199) 945 F.2d 269 ..................................................................................................5

**Statutes**
California Commercial Code Section 1305 ..................................................................................9
California Commercial Code Section 2711(1)(b)..........................................................................5
California Commercial Code Section 2712(2) ..............................................................................5
California Commercial Code Section 2713 ..........................................................................passim
California Commercial Code Section 2713(1) ..............................................................................5
California Commercial Code Section 2723 ..................................................................................4
California Commercial Code Section 2724 ..................................................................................6
California Commercial Code Section 2711 ..................................................................................5
California Commercial Code Section 2711(1)(a)..........................................................................5

Plaintiff and counterdefendant CMA CGM, S.A. (hereinafter "CMA") submits this Trial Brief.

## I. OVERVIEW

As the Court knows from the three previous motions for partial summary judgment, this case involves a lease contract for approximately 7,200 cargo containers, entered into in 2007 (designated the "7006SF lease"). Plaintiff CMA, which is an ocean carrier that operates a fleet of cargo ships, was the lessee of the containers. The lessor was defendant Waterfront Container Leasing Company, Inc. ("Waterfront"). The lease contained an option by which CMA could purchase the leased containers from Waterfront, at prices set out in the lease. When CMA exercised the purchase option in January of 2012, near the end of the 5-year lease term, Waterfront refused to sell the containers to CMA. CMA was therefore forced to start returning the containers to Waterfront and sue Waterfront for breach of contract.

The Court has made three rulings in this matter which have eliminated every issue except how damages should be determined. The Court ruled (on May 31, 2013 – Document 19) that CMA owed to Waterfront daily rental charges, known as "per diem" until the containers were returned to Waterfront. The Court ruled (on October 15, 2013 – Document 35) that Waterfront's failure to honor CMA's exercise of the purchase option was a breach of the 7006SF lease contract. The Court subsequently ruled (on December 13, 2013 – Document 50) that Waterfront must specifically perform the purchase option sale with regard to the containers that had not yet been returned by CMA to Waterfront.

Pursuant to the December 13, 2013 ruling, CMA stopped returning the containers to Waterfront and, on February 19, 2014, Waterfront issued an invoice to CMA in the amount of $2,509,550, representing the contractually agreed purchase option price for the 2,590 containers still in CMA's

possession. On February 27, 2014, CMA paid that amount in full to Waterfront.

After the Court made the above-referenced rulings, the parties attempted to reach an agreement on the amount of damages that Waterfront owed to CMA, and how much per diem and related charges CMA owed to Waterfront. An agreement could not be reached on either issue.

Therefore, the parties have returned to the Court, needing several more legal rulings discussed below, and a factual ruling, also discussed below, which has necessitated this trial.

## II. THE PRIMARY REASON FOR THE REMAINING DISPUTE

The underlying reason for this lawsuit and the primary reason that the parties are still in a dispute, even after the Court has made its three rulings, has to do with the market price of cargo containers. From January 2012 and continuing until today, the market price of the containers has always been higher than the purchase option price for which Waterfront contractually promised to sell the containers to CMA. Had the purchase option price been above the market price of the containers, Waterfront would have gladly sold them to CMA for the purchase option price and this lawsuit would never have occurred.

However, though the market price of cargo containers has been higher than the contractual purchase option price at all times relevant to this suit, the market price has not been stable. The market price has declined steadily since 2012. As a result, the market price of the containers at the time Waterfront breached the contract in 2012 was significantly higher than it is today. After Waterfront breached the contract, CMA returned containers to Waterfront from mid-2012 through the end of 2013, with the market price of the containers falling, particularly during the latter part of that period.

As explained in more detail below, the primary dispute over CMA's

damages stems from Waterfront's insistence that, because the market price of containers has fallen as CMA was returning containers to Waterfront, the Court should ignore or modify the established rule applicable to a seller's repudiation of a sales agreement.

## III. THE PURELY LEGAL ISSUES

The parties disagree over two primary legal issues: (1) the legal measure of CMA's damages and; (2) under the 7006SF lease contract language, for what period of time does CMA owe to Waterfront per diem for any containers that were, or are still, in CMA's possession.

### A. CMA's Damages for the Returned Containers

It is undisputed that, after Waterfront refused to honor the purchase option and CMA was forced to start returning the containers to Waterfront, CMA returned 4,590 of the 7006SF lease containers to Waterfront. When CMA began returning the containers to Waterfront, they were scattered around the globe, mixed in among the 1.3 million containers that CMA owns or has under other leases. CMA stopped returning the containers, following the Court's ruling in December 2013 that Waterfront should specifically perform the sale to CMA of the containers still in CMA's possession.

The parties agree that, since the market price of the containers has always been higher than the purchase option price for which Waterfront should have sold the containers to CMA in 2012, CMA's damages for the returned containers should be determined by some measure of the market price of the containers, minus the purchase option price.

The parties disagree over the legal issue of what market price should be used for this determination. As noted above, this issue has arisen for one reason only; the market price of containers has fallen since 2012, when Waterfront breached the contract, with the most dramatic decrease in market prices occurring since mid-2013. As CMA returned containers to Waterfront

3

damages stems from Waterfront's insistence that, because the market price of containers has fallen as CMA was returning containers to Waterfront, the Court should ignore or modify the established rule applicable to a seller's repudiation of a sales agreement.

## III. THE PURELY LEGAL ISSUES

The parties disagree over two primary legal issues: (1) the legal measure of CMA's damages and; (2) under the 7006SF lease contract language, for what period of time does CMA owe to Waterfront per diem for any containers that were, or are still, in CMA's possession.

### A. CMA's Damages for the Returned Containers

It is undisputed that, after Waterfront refused to honor the purchase option and CMA was forced to start returning the containers to Waterfront, CMA returned 4,590 of the 7006SF lease containers to Waterfront. When CMA began returning the containers to Waterfront, they were scattered around the globe, mixed in among the 1.3 million containers that CMA owns or has under other leases. CMA stopped returning the containers, following the Court's ruling in December 2013 that Waterfront should specifically perform the sale to CMA of the containers still in CMA's possession.

The parties agree that, since the market price of the containers has always been higher than the purchase option price for which Waterfront should have sold the containers to CMA in 2012, CMA's damages for the returned containers should be determined by some measure of the market price of the containers, minus the purchase option price.

The parties disagree over the legal issue of what market price should be used for this determination. As noted above, this issue has arisen for one reason only; the market price of containers has fallen since 2012, when Waterfront breached the contract, with the most dramatic decrease in market prices occurring since mid-2013. As CMA returned containers to Waterfront

3

CMA CGM, S.A.'s TRIAL BRIEF — Case No. C-12-5467-JSC

damages stems from Waterfront's insistence that, because the market price of containers has fallen as CMA was returning containers to Waterfront, the Court should ignore or modify the established rule applicable to a seller's repudiation of a sales agreement.

## III. THE PURELY LEGAL ISSUES

The parties disagree over two primary legal issues: (1) the legal measure of CMA's damages and; (2) under the 7006SF lease contract language, for what period of time does CMA owe to Waterfront per diem for any containers that were, or are still, in CMA's possession.

### A. CMA's Damages for the Returned Containers

It is undisputed that, after Waterfront refused to honor the purchase option and CMA was forced to start returning the containers to Waterfront, CMA returned 4,590 of the 7006SF lease containers to Waterfront. When CMA began returning the containers to Waterfront, they were scattered around the globe, mixed in among the 1.3 million containers that CMA owns or has under other leases. CMA stopped returning the containers, following the Court's ruling in December 2013 that Waterfront should specifically perform the sale to CMA of the containers still in CMA's possession.

The parties agree that, since the market price of the containers has always been higher than the purchase option price for which Waterfront should have sold the containers to CMA in 2012, CMA's damages for the returned containers should be determined by some measure of the market price of the containers, minus the purchase option price.

The parties disagree over the legal issue of what market price should be used for this determination. As noted above, this issue has arisen for one reason only; the market price of containers has fallen since 2012, when Waterfront breached the contract, with the most dramatic decrease in market prices occurring since mid-2013. As CMA returned containers to Waterfront

3

from mid-2012 until January 2014, Waterfront has been selling them for continually decreasing prices, as the market price has dropped.

CMA contends that its damages for the returned containers should be measured by the market price prevailing at or around the time of the breach in 2012, minus the purchase option price. CMA will present substantial evidence of what that price was in 2012. Waterfront, on the other hand, contends that CMA's damages should be measured by the ever decreasing prices that Waterfront has been obtaining for the containers, after they were returned by CMA, minus the purchase option price. Those sales are ongoing, at prices that continue to decrease.

There should be no dispute on this issue, as it is clearly resolved by the California Commercial Code.

The 7006SF lease contract, drafted by Waterfront, provides that "this Agreement shall be governed and construed in accordance with the laws of the State of California." The rule for measuring CMA's damages arising from Waterfront's refusal to sell the containers to CMA under the purchase option is set out in a California statute; Section 2713 of the California Commercial Code:

> **§ 2713. Buyer's damages for non-delivery or repudiation**
>
> (1) Subject to the provisions of this division with respect to proof of market price (Section 2723), the measure of damages for non-delivery or repudiation by the seller is ***the difference between the market price at the time when the buyer learned of the breach and the contract price*** together with any incidental and consequential damages provided in this division (Section 2715), but less expenses saved in consequence of the seller's breach.
>
> (2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Emphasis added.

Recovery by the buyer of the market price at the time the buyer learns of

4

the breach is consistent with the alternative remedy available to buyers under California Commercial Code Section 2711; when a seller repudiates a sale, the buyer may "cover," by purchasing replacement goods at the prevailing market price and then recover the difference between the price of the replacement goods and the contract price. See California Commercial Code Section 2711(1)(a) and (b).

The Court need look no further than *R.B. Matthews, Inc.. v. Transamerica Transportation Services, Inc.* 945 F.2d 269 (9th Cir. 1991), to confirm that the proper legal measure of CMA's damages is governed by California Commercial Code Section 2713. In *R.B. Matthews*, the Ninth Circuit, applying California law to analogous facts (breach of a contract for the sale of used trailers), stated that:

> The rules for measuring damages are very simple. When a seller breaches the contract, the buyer has two possible remedies. First, he may attempt to cover and obtain goods in substitution for those due from the seller. *See* Cal. Com. Code Ann. § 2711(1)(a) … If he covers, he can recover the difference between the cost of cover and the contract price together with any incidental or consequential damages. *Id.* § 2712(2). …
>
> The buyer's second remedy is to recover the difference between the market price and the contract price. *Id.* § 2711(1)(b), 2713(1). In this case the contract-market price differential is the difference between the market price of the unmodified trailers (the seller) agreed to provide (the buyer) and the contract price of those trailers.

945 F.2d at 274-75.

Thus, since CMA did not "cover" by purchasing other used containers, CMA is entitled to the prevailing market price of the containers at the time it learned from Waterfront that Waterfront was refusing to honor the purchase option, minus the purchase option price.

It is undisputed that CMA exercised the purchase option in writing on January 30, 2012 and, on January 31, 2012, Waterfront first informed CMA, in

5

writing, that it refused to honor the purchase option. The 7006SF lease period ended on May 1, 2012 and on that date the containers, which were scattered around the globe, should have been sold to CMA. CMA will present substantial evidence at trial of the prevailing market price of the containers on and around the time period of February to May of 2012. Since container prices vary between the major global regions (Asia, North America, Europe, etc.) and the containers were scattered throughout the world, CMA will also present substantial evidence of the market price in that time period, "at the place of tender," (Cal. Comm. Code Section 2713(2)), i.e. around the globe where the containers were located at the time CMA learned of the breach.[1]

With the California choice-of-law provision in the 7006SF lease contract, and a California statute that plainly sets out the formula for measuring a buyer's damages for a repudiation by the seller of a sales contract, there should be no "issue" regarding CMA's damages.

### 1. Waterfront Hopes to Avoid the Plain Meaning of Section 2713

Waterfront, nevertheless, contends that CMA should recover damages based upon the average price that Waterfront has obtained from selling the containers as they were returned by CMA, minus the purchase option price. That average price has been falling since mid-2013 and continues to fall to this day, as Waterfront continues selling the returned containers for ever-decreasing prices.

Though CMA does not know Waterfront's legal basis for arguing that

---

[1] Such evidence is not limited to CMA or Waterfront's actual sales but may also be based on market quotations "when the price or value of goods traded "in any established market" is in issue. The reason of the section does not require that the market be closely organized in the manner of a produce exchange. It is sufficient if transactions in the commodity are frequent and open enough to make a market established by usage in which one price can be expected to affect another and in which an informed report of the range and trend of prices can be assumed to be reasonably accurate." Comment to Cal. U. Com. Code §2724, Admissibility of Market Quotations

the Court should disregard California Commercial Code Section 2713, CMA anticipates that Waterfront will argue that, because the market price of the containers was falling as CMA returned the containers to Waterfront, the speed at which CMA returned the containers prevented Waterfront from selling the containers for enough money to cover the damages that Waterfront owes to CMA if Section 2713 is applied. There are many problems with this argument, among which are:

1. It asks the Court to create a new rule of law, contrary to the California statute (Section 2713) that plainly states how CMA's damages should be determined;

2. Waterfront should not be heard to complain about a consequence that stemmed wholly from Waterfront's breach of the contract – CMA would not have been returning any containers, but for Waterfront's breach;

3. The Court has ruled that CMA must pay rental fees (per diem) to Waterfront until the containers were returned. Thus, Waterfront will be compensated by CMA at the contract rental rate for the period of time it took CMA to return the containers;

4. The fact that the market price of containers fell after Waterfront breached the contract was not caused by CMA and it is irrelevant to CMA's measure of damages under Section 2713. The market price could have fallen, risen, or stayed the same after Waterfront breached the contract. Had the market price risen or stayed the same, Waterfront would not now be making any argument about the speed at which CMA returned the containers;

5. After Waterfront's breach forced CMA to begin returning the containers, CMA had a legal duty to mitigate its damages and did so by returning containers to Waterfront when a container would, in the normal course of CMA's shipping business, circulate to a location where Waterfront had a return depot. CMA did not incur the substantial expense of plucking

7

Waterfront's containers from the 1.3 million containers in CMA's fleet, scattered around the globe, and make special shipments for Waterfront's containers to Waterfront's return depots. As a result, CMA is making no claim against Waterfront for "incidental and consequential damages" recoverable under California Commercial Code Sections 2713 and 2715. Had CMA instead made special arrangements to hunt down Waterfront's containers and specially ship them directly to Waterfront's return depots as quickly as possible, CMA would have a significant claim against Waterfront for "incidental and consequential damages."

California Commercial Code Section 2713 governs this situation. There is no legal, logical or equitable reason why CMA should not recover the difference between the market price of the containers at the time CMA learned of the breach, minus the purchase option price, as dictated by California law.

### 2. Waterfront's Position is Contrary to Basic Contract Principles

California has long recognized that predictability and certainty in the law of contracts is essential to the smooth performance of contractual relations. California Commercial Code Section 2713 provides predictability and certainty for parties involved in a sale of goods. The seller knows that if it repudiates the sale, the measure of damages will be the difference between the then-existing market price and the agreed sale price. Waterfront's argument, if accepted, would erase that certainty, substituting whatever random market fluctuations might later occur in the price of the goods, for the market price existing at the time the seller makes its decision to repudiate the sale.

As the court stated in *KGM Harvesting Company v. Fresh Network* (1995) 36 Cal.App.4th 376:

> The basic object of (contract) damages is that the party injured by the breach should receive as nearly as possible the equivalent of the benefits of performance (and such a system) furthers the goal of 'predictability

about the cost of contractual relationships ... in our commercial system.' 36 Cal.App.4th at 382.

The California Supreme Court has emphasized that breach of contract remedies should operate "to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.

The rule proposed by Waterfront, that CMA's damages should depend upon the speed at which CMA returned the containers and the speed at which Waterfront sold the containers as they were returned, which is subject to market price fluctuations that have taken place since 2012, would provide no "predictability about the cost" of Waterfront's breach, nor enable either party to "estimate in advance the financial risks" associated with breaching the contract. On the other hand, awarding to CMA the market price at the time of the breach, minus the agreed purchase price, as dictated by California Commercial Code Section 2713, provides both the seller and the buyer with predictability and certainty about the cost of breaching the contract. With Section 2713 as the rule of law, a seller who is considering repudiating a sale can determine the cost of such an action, with certainty.

### 3. CMA Could Have Sold the Containers

CMA anticipates that Waterfront will alternatively argue that CMA must prove the amount for which CMA could have sold the containers, had Waterfront honored the purchase option. Waterfront will likely claim that CMA could not have sold the containers any faster than Waterfront sold them, including the sales in 2013 and continuing to today, in the falling market.

Though CMA strongly disagrees that California Commercial Code Section 2713 requires a buyer to prove how quickly, and for how much, it could have sold the goods, CMA will be prepared to present substantial

evidence at trial that, had Waterfront sold the containers to CMA in 2012, CMA could have sold them within about 6 months in 2012, at the higher then-prevailing market prices.

As set out in California Commercial Code Section 1305:

**§ 1305. Remedies to be liberally administered.**

(a) The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed ...

If the Court deems it necessary, CMA will prove at trial that, had Waterfront sold the containers to CMA in 2012, the "position" that CMA would have been in is that it could have sold the containers for the higher prices prevailing in 2012. Therefore, even ignoring the measure of damages dictated by California Commercial Code Section 2713, in order for CMA to be placed in "as good a position as if (Waterfront) had fully performed," CMA will be entitled to prevailing market prices in 2012, minus the purchase option price.

However, as discussed above, Section 2713 contains no requirement that a buyer prove that it could have sold the goods, and for how much, had the seller not repudiated the sale. It would be absurd to require buyers of goods (which includes individual consumers, as well as businesses) to prove that they could have resold the goods, and for how much. Upon purchasing the containers, CMA could have used them indefinitely, sold them, or simply held them. Under Section 2713, regardless of what CMA did with the containers, its damages would be measured by the same simple formula.

**B.** **CMA's Damages for the Unreturned Containers**

As noted above, following the Court's ruling in December 2013 that Waterfront should specifically perform the sale of the containers that remained in CMA's possession, Waterfront issued an invoice to CMA on February 19,

10

2014, for the purchase option price of the remaining containers. CMA paid the invoice in full on February 27, 2014. However, CMA has suffered additional damages in connection with these containers that it has recently purchased.

Between May 2012, when all of the containers should have been sold to CMA pursuant to the purchase option, and February of 2014, when Waterfront sold the remaining 2,590 of the containers to CMA (by Court Order), the value of the 2,590 containers dropped significantly. Therefore, CMA has purchased containers whose market value is lower than the value of the containers that Waterfront was supposed to sell to CMA in 2012.

Since "the basic object of (contract) damages is that the party injured by the breach should receive as nearly as possible the equivalent of the benefits of performance ..." (*KGM Harvesting v. Fresh Network* (1995) 36 Cal.App.4th 376, 382), CMA should be awarded the market price differential between the higher market price of the containers in 2012 at the time of the breach and market price of the containers as of the time of the sale in February 2014.

CMA is prepared to present substantial evidence at trial of that market price differential.

C.    **The Legal Dispute Over Rental Charges**

On May 31, 2013, pursuant to a motion filed by Waterfront, and prior to the Court's rulings that Waterfront had breached the contract and that Waterfront must specifically perform the purchase option with regard to the unreturned containers, the Court ruled that CMA owed daily rental charges to Waterfront while it was still in possession of the containers.

Even though CMA has now either returned or paid for all of the containers under the 7006SF lease, Waterfront continues to issue new invoices to CMA, reflecting continuing daily rental charges for the 2,590 containers for which CMA paid Waterfront on February 27, 2014. Waterfront contends that it is entitled to continuing rental charges on the 2,590 containers for which CMA

has paid the purchase price under a provision of the purchase option which states:

> Title (to the containers) shall pass to Lessee following receipt of the Purchase Option price and per diem rates up to and including the last day of the agreed lease period.

CMA has not paid per diem under the 7006SF lease since May of 2012 (the end of the 7006SF lease period) for the simple reason that CMA's damages will exceed the amount of per diem owed to Waterfront. CMA is not going to pay money to Waterfront when Waterfront owes a greater amount to CMA. Waterfront, however, contends that the above-quoted language provides that per diem continues to run on the 2,590 containers until CMA has paid all of the per diem to which Waterfront believes it is entitled.

Neither the quoted provision, nor anything else in the contract, entitles Waterfront to collect continuing per diem from CMA on any of the containers. At most, the quoted provision might be read to provide that CMA does not have "title" to the 2,590 containers, until per diem on those containers is paid to the end of the "agreed lease period." However, the "agreed lease period" of the 7006SF lease ended on May 1, 2012. It is undisputed that CMA paid all per diem due through that date. Therefore, the provision does not even support an argument that title has not passed to CMA for the 2,590 containers. Waterfront is not entitled to continuing per diem payments.

Legally and logically, per diem should have stopped on October 15, 2013, when the Court ruled that Waterfront had breached the contract. At that point there was no longer any question that Waterfront should have sold to CMA any containers remaining in CMA's possession. Waterfront should not, by its own refusal to immediately sell the containers to CMA following that ruling, be allowed to continue extracting per diem from CMA beyond that

date.[2] If it was not clear following the Court's October 15, 2013, ruling that Waterfront's should immediately sell the remaining containers to CMA, it was made crystal clear on December 13, 2013, when the Court ruled that Waterfront must specifically perform the purchase option sale with regard to the remaining containers.

So that the parties can accomplish a final accounting, CMA requests a ruling on the date upon which rental charges (per diem) should have ceased on containers in CMA's possession.

### D. Waterfront is Not Entitled to Repair Costs

The last legal dispute that must be resolved in order for the parties to reconcile their competing money claims concerns alleged "repair costs" claimed by Waterfront.

As CMA returned the 4,590 containers to Waterfront's various container depots, Waterfront put them up for sale "as-is, where-is," without moving the containers, cleaning the containers or making any repairs to the containers. Yet Waterfront has included in its claimed damages a charge against CMA for over $240,000 in "repairs" to the returned containers. Waterfront contends that this figure represents the amount of repairs that the returned containers needed to bring them up to full market price at the times of their respective sales, even though the repairs were never performed. Waterfront should not be awarded these hypothetical repair damages for at least four reasons.

First, and most obviously, since Waterfront did not carry out any repairs on the returned containers, Waterfront incurred no repair costs and should not be awarded money that it did not expend.

Second, Section 19 of the 7006SF Contract, entitled "Damaged

---

[2] Arguably, the Court's ruling that Waterfront had breached the contract should negate Waterfront's collection of any per diem, going back to May 1, 2012; the date upon which the containers should have been sold to CMA. Had Waterfront not breached the contract, CMA would have owned the containers starting on May 1, 2012 and would have owed no per diem to Waterfront beyond that date.

Equipment" provides that "(f)ull DPP is applicable." The abbreviation "DPP" means "damage protection plan." Waterfront, like most container leasing companies, provides its customers with insurance for containers that are damaged, but not totally destroyed. The cost or premium for the damage protection plan is built into the per diem charged by the leasing company to the customer. Therefore, any alleged damage to the returned containers is, by contract, covered by the DPP provided by Waterfront, and CMA should not have to pay for any such alleged damage.

Third, had Waterfront honored the purchase option and sold the containers to CMA in 2012, CMA would pay no repair costs to Waterfront. If CMA must pay $240,000 in hypothetical repair costs to Waterfront now, CMA will be in a much worse position than it would have been, had Waterfront honored its obligations under the contract.

Finally, Waterfront's claim for repair costs is inconsistent with Waterfront's argument that CMA's damages related to the returned containers should be limited to the prices that Waterfront obtained when it sold the returned containers. If Waterfront sold a container at a reduced price because it needed repairs, and Waterfront claims that is all CMA should receive as damages for such container, an additional payment to Waterfront of a hypothetical repair cost for that container would simply be a windfall to Waterfront.

CMA seeks a legal ruling that Waterfront is not entitled to "repair costs" that were not incurred by Waterfront.

## IV. THE FACTUAL ISSUES FOR TRIAL

The factual issues necessitating this trial have been discussed above. They are:

    A.    What was the market price of the containers at the time that CMA learned that Waterfront was repudiating the purchase option, for the

14

purpose of calculating CMA's damages pursuant to California Commercial Code Section 2713?;

B. For what prices could CMA have sold the containers, if Waterfront had honored the purchase option (this is only an issue if the Court does not apply California Commercial Code Section 2713)?

At trial CMA will present substantial evidence of the market price of the containers at the time CMA learned of Waterfront's refusal to honor the purchase option. If the Court deems it necessary, CMA will also present substantial evidence that it could have sold the 7006SF containers at prevailing market prices in 2012, had Waterfront honored the purchase option, and what were those prevailing prices.

## V. CMA'S DAMAGES CALCULATION

### A. CMA's Damages for the Returned Containers

Following the presentation of evidence at trial, CMA will set out the simple mathematical calculation of its damages related to the returned containers, calculated by:

under Cal.Comm.Code §2713, the market price of the containers on or around February to May 2012, multiplied by the number of returned containers, minus the purchase option price for those containers.

That Calculation will show that the CMA's damages with regard to the returned containers, is $4,041,910.

If the Court requires CMA to present evidence that it could have sold the containers, CMA will present evidence of the price for which CMA could have sold them, multiplied by the number of returned containers, minus the purchase option price for those containers. Based upon such an approach, CMA's damages with regard to the returned containers is $3,158,290.

CMA will seek an award of interest on its damages, at the legal rate, from the time of Waterfront's breach of the contract.

### B. CMA's Damages for the Purchased Containers

Following the presentation of evidence at trial, CMA will set out the

15

simple mathematical calculation of its damages related to the containers that Waterfront has recently sold to CMA (under Court Order), calculated by the market price of the containers on or around February to May 2012, minus the market price in February 2014, multiplied by the number of purchased containers. That Calculation will show that CMA's damages with regard to the containers it purchased from Waterfront is $949,124.

## VI. CONCLUSION

"(T)he basic object of (contract) damages is that the party injured by the breach should receive as nearly as possible the equivalent of the benefits of performance ..." (*KGM Harvesting v. Fresh Network* (1995) 36 Cal.App.4th 376, 382),

Every argument advanced by Waterfront would result in CMA being denied the benefits that it would have received, had Waterfront performed. To the contrary, Waterfront seeks to escape the consequences of its breach and leave CMA with significant uncompensated damages.

CMA seeks nothing more or less than application of the controlling law to the facts to be presented at trial. The result of that process will provide CMA with, as nearly as possible, the equivalent of the benefits of the contract, had Waterfront performed.

Respectfully submitted.

Dated: May 22, 2014

COX, WOOTTON, LERNER,
GRIFFIN, HANSEN & POULOS, LLP
Attorneys for Plaintiff and
Counterdefendant CMA CGM, S.A.

By: /s/
Mitchell S. Griffin