1
**COX, WOOTTON, LERNER.**
**GRIFFIN, HANSEN & POULOS, LLP**

2
Mitchell S. Griffin (SBN 114881)
Christopher S. Kieliger (SBN 209121)

3
mgriffin@cwghp.com
190 The Embarcadero

4
San Francisco, CA  94105
Telephone No.: 415-438-4600

5
Facsimile No.: 415-438-4601

6
Attorneys for Plaintiff and
Counter Defendant CMA CGM, S.A.

7

8

9
**UNITED STATES DISTRICT COURT**

10
**NORTHERN DISTRICT OF CALIFORNIA**

11
**SAN FRANCISCO DIVISION**

12
CMA CGM, S.A.                                     Case No.:  **C 12 5467 JSC**

13
                          Plaintiff,             **CMA CGM, S.A.'s POST**
                                                 **TRIAL BRIEF**

14
          v.

15

16
WATERFRONT CONTAINER
LEASING COMPANY, INC.

17
                          Defendant.

18
WATERFRONT CONTAINER
LEASING COMPANY, INC.

19

20
                          Counterclaimant,

21
          v.

22
CMA CGM, S.A.

23
                          Counter Defendant.

24

25

26

27

28

COX, WOOTTON,
LERNER, GRIFFIN,
HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL: 415-438-4600
FAX: 415-438-4601

CMA/WCLI

# TABLE OF CONTENTS

I. SUMMARY OF THIS BRIEF ................................................................1

II. CMA'S DAMAGES ........................................................................1

   a. The Containers that CMA Returned to Waterfront .....................2

     1. The Measure of This Element of Damages.........................2

     2. What is the "Market Price"?.........................................3

     3. Waterfront's Alternative Theories Regarding CMA's Damages.........7

   b. The Containers that CMA Purchased from Waterfront.......................11

     1. Per Diem Attributable to the 2,590 Containers .....................12

     2. Loss of Value/Diminution ...........................................15

   c. Summary of CMA's Damages Not Including Interest..........................16

III. WATERFRONT'S CLAIMS ................................................................16

   a. Per Diem ..............................................................16

   b. Reduced Market Price from CMA's Returns ...............................17

     1. Waterfront's "Conversion" Argument .............................19

     2. Waterfront's Breach of Contract Argument........................20

     3. Decrease in Value of Containers Sold to CMA ....................21

IV. SUMMARY OF DAMAGES – THE NET/NET PLUS INTEREST ......22

a. Using Expert Passal's Opinions ........................................22

b. Using Waterfront 2012 Sales Figures....................................22

c. Waterfront's Offset....................................................22

d. Net Damages...........................................................23

e.   Prejudgment Interest.................................................................................23

V.  CONCLUSION.......................................................................................26

CMA CGM, S.A.'s POST TRIAL BRIEF                                              Case No. C-12-5467-JSC

1
2
3

# TABLE OF AUTHORITIES

4

Authority                                                                 Page

5

**Cases**

6
7

*Allied Canners & Packers v. Victor Packing Company* (1984)
   162 Cal.App.3d 905 .......................................................... 12

8

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994)
   7 Cal.4th 503, 515 .......................................................... 11

9
10

*Bare v. Richman & Samuels, Inc.* (1943)
   60 Cal.App. 2d 413 .......................................................... 27

11

*Brown v. Grimes,* (2011)
   192 Cal.App. 4th 265 ........................................................ 22

12
13

*Howe v. City Title Insurance Co.* (1967)
   255 Cal.App. 2d 85 .......................................................... 27

14

*H-W-H Cattle Company v. Schroeder*
   767 F.2d 437 (8th Cir. 1985).............................................. 12

15
16

*Imagenetix, Inc. v. Frutarom USA, Inc.* (S.D. CA 2013)
   2013 U.S. Dist. LEXIS 173193, *24 ...................................... 22

17

*Internet Brands, Inc. v. Ultimatecoupons.com, LLC* (C.D. CA 2013)
   2013 U.S. Dist. LEXIS 74114, *3 ........................................ 22

18
19

*KGM Harvesting Company v. Fresh Network*
   (1995) 36 Cal.App.4th 376 ........................................... 10, 17

20

*Promex, LLC v. Hernandez* 781 F.Supp 2d 1013
   (C.D. CA 2011) .............................................................. 22

21
22

*R.B. Matthews, Inc. v Transamerica Transportation Services, Inc.*
   945 F.2d 269 (9th Cir. 1991).............................................. 8

**Statutes**

23
24

Cal. Civ. Code §3287(a) ...................................................... 25, 27

25

Cal. Com. Code Ann. § 2711(1)(a)........................................ 8

26
27

Cal. Com Code §2610 .......................................................... 22

28

California Civil Code §3287(a) .............................................. 25

California Commercial Code §2713 ........................................................*passim*

California Commercial Code §2724 .....................................................................6

California Commercial Code §2711 .....................................................................7

California Commercial Code §2711(1)(a).............................................................7

California Commercial Code §1305……………………………………………….26

Plaintiff and Counter Defendant CMA CGM, S.A. (hereinafter "CMA") submits this Post Trial Brief.

## I.   SUMMARY OF THIS BRIEF

In this final phase of the case, the parties have presented competing views of who owes what to whom. This brief, therefore, first sets out what CMA contends it is owed as damages by defendant Waterfront Container Leasing Company, Inc. ("Waterfront"), followed by CMA's contentions with regard to Waterfront's claims. As set out below, CMA contends that, after accounting for all of the competing claims, CMA is owed a net amount of either $3,655,975.23 or $3,273,084.23, plus prejudgment and post-judgment interest thereon, at the legal rate, all as set out in detail below.

CMA respectfully submits that, in order to bring a final resolution to this case, a decision and judgment from the Court is necessary, setting out the actual dollars and cents awarded. It is CMA's intention with this brief to provide not just the bottom-line net amount that is owed to CMA, but to provide the Court with the calculations required to reach that bottom-line figure.

## II.   CMA'S DAMAGES

CMA contends that its total damage amount can be divided into two categories: (a) damages related to the 4,590 containers that CMA returned to Waterfront as a result of Waterfront's breach of "Term Lease Agreement No. T07006SF" (the "7006SF Lease" – trial EXHIBIT 1)[1] and; (b) damages related to the 2,590 containers that CMA purchased from Waterfront on February 27, 2014, following the Court's Order on December 13, 2013, that Waterfront should specifically perform the purchase option provision contained in the 7006SF Lease.

---

[1] All "EXHIBITS" referenced in this brief are the trial exhibits introduced at trial by the respective parties, unless otherwise specified.

1

CMA CGM, S.A.'s POST TRIAL BRIEF                                  Case No. C-12-5467-JSC

a.   <u>The Containers that CMA Returned to Waterfront</u>

1.   **The Measure of This Element of Damages**

The parties agree that, after Waterfront refused to honor the purchase option, CMA returned 4,590 of the 7006SF Lease containers to Waterfront.

CMA contends, and it appears that Waterfront concedes, at least in connection with its "Alternative B" damage calculation (see EXHIIBIT T), that since Waterfront repudiated the contractual purchase option sale provision (see EXHIBIT 1, page 3, "Purchase Option" provision), CMA's measure of damages for the 4,590 returned containers is governed by California Commercial Code Section 2713, which provides:

§ **2713. Buyer's damages for non-delivery or repudiation**

(1) Subject to the provisions of this division with respect to proof of market price (Section 2723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this division (Section 2715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Emphasis added.[2]

CMA learned of the breach on January 31, 2012, when Waterfront wrote to CMA, (see EXHIBIT 4) that it was refusing to honor CMA's exercise of the purchase option (See EXHIBIT 3). The 5-year term of the 7006SF Lease expired on April 30, 2012. Therefore, had Waterfront honored the purchase option, CMA would have taken ownership of the containers on May 1, 2012. See EXHIBIT 1, page 4, "Lease Period" provision. Thus, either January 31,

---

[2] The 7006SF Lease, drafted by Waterfront, provides that "this Agreement shall be governed and construed in accordance with the laws of the State of California." See EXHIBIT 1, page 27, "Governing Law" provision.

2012 or May 1, 2012 should be considered to be the "time when the buyer learned of the breach" for the purposes of §2713. CMA's expert witness Roger Passal testified at trial that there was no appreciable difference between the market price of the containers on January 31, 2012 and May 1, 2012. See Reporters Transcript (hereinafter "R.T.") 95:23-96:6. There was no testimony, and there is no evidence to the contrary. Therefore, whether January 1, 2012 or May 1, 2012 is considered to be the "time when the buyer learned of the breach," for the purpose of applying California Commercial Code Section 2713, is of no import to measuring this element of CMA's damages.

The contract price, for purposes of applying §2713, is also beyond dispute. It is spelled out in the purchase option provision as $750 for each 20' container, $1,200 for each 40' container and $1,300 for each 40' high cube ("HC") container. See EXHIBIT 1, page 3, "Purchase Option" provision.

However, the third element of the §2713 formula, the "market price (at the time the buyer learns of the repudiation) ... as of the place for tender," was not agreed upon between the parties.

### 2.    What is the "Market Price"?

CMA contends that the "market price" of the 7006SF Lease containers, at the time that CMA learned of the repudiation of their sale by Waterfront, is simply the price for which like-kind containers, *and the actual subject containers,* were selling at the relevant time period in the places where the subject containers were located. CMA therefore presented testimony from expert Roger Passal with regard to:

1.    The average prices for which CMA actually sold older similar used 20', 40' and 40'HC containers in the relevant locations during 2012;

2.    The average prices for which Waterfront actually sold more than 1,000 of the subject 20', 40' and 40'HC containers in the relevant locations during 2012;

3

3.     The average prices published in an industry publication (the Harrison Report – EXHIBIT 24, page 18) for similar used 20', 40' and 40' HC containers in the relevant locations during 2012;[3]

4.     Mr. Passal's opinion of the market prices for the subject 20', 40' and 40'HC containers in the relevant locations during 2012, based upon all of the information he reviewed and considered.

The CMA average 2012 sales prices, Waterfront average 2012 sales prices and Harrison Report average 2012 sales prices, appear in the column headed "2012" on EXHIBIT 27, which Mr. Passal identified and discussed at trial. R.T. 97:18-103:22; 106:16-109:12. There was no contrary evidence nor witness contesting those figures.[4]

Mr. Passal's opinions regarding the market prices of the three types of containers during 2012 appear in the far right hand column of EXHIBIT 33, and on EXHIBIT 34 at page 4 (Mr. Passal's report), both of which Mr. Passal identified and discussed at trial. R.T. 103:23-106:15; 109:16-111:15.

---

[3] As discussed by Mr. Passal, the Harrison Report is an industry publication that provides historical data with regard to the prices of containers. R.T. 90:16-91:19. Such publications are specifically made admissible by California Commercial Code §2724, in cases such as this, where the market price of goods are at issue. §2724 provides that:

> Whenever the prevailing price or value of any goods regularly bought and sold in any established commodity market is in issue, reports in official publications or trade journals or in newspapers or periodicals of general circulation published as the reports of such market shall be admissible in evidence. The circumstances of the preparation of such a report may be shown to affect its weight but not its admissibility.

Section 2724 does not just apply to commodity markets with fixed prices. The "Comments" to §2724 make it clear that it applies to this case and the Harrison Report:

> Market quotations are made admissible when the price or value of goods traded "in any established market" is in issue. The reason of the section does not require that the market be closely organized in the manner of a produce exchange. It is sufficient if transactions in the commodity are frequent and open enough to make a market established by usage in which one price can be expected to affect another and in which an informed report of the range and trend of prices can be assumed to be reasonably accurate.

[4] Waterfront is identified as "WCL" on EXHIBIT 27.

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   Mr. Passal analyzed and confirmed that the average 2012 sales prices obtained by CMA and Waterfront, and set out in the Harrison Report, were for containers sold in roughly the same places as the Waterfront containers were located at the time of the repudiation. Those locations are shown on EXHIBITS 17 and 18, which are CMA's January 31, 2012 and April 30, 2012 container Position Reports for the 7006SF Lease containers, which were identified by CMA's Mr. Michel. R.T. 25:21-27:23. Mr. Passal's location comparison and analysis, showing that the 7006SF Lease containers were, at the time of the repudiation, similarly situated as those sold by CMA and Waterfront in 2012, and those included in the Harrison report, is summarized on EXHIBIT 33, which Mr. Passal identified and discussed at trial. R.T. 103:23-106:15.

   Recovery by CMA based upon this analysis of the meaning of "market price" (i.e. the actual market price for sales of the 7006SF Lease containers and similar containers, in the places where the containers were located at the time of the repudiation) is consistent with the alternative remedy available to a spurned buyer under California Commercial Code Section 2711; when a seller repudiates a sale, the buyer may "cover," by purchasing replacement goods at the prevailing market price where the goods were to be tendered to the buyer, and then recover the difference between the price of the replacement goods and the contract price. See California Commercial Code Section 2711(1)(a) and (b).

   Had CMA elected to "cover" when Waterfront breached the purchase option provision and purchased replacement containers in the various places where the Waterfront containers were located, CMA would have been entitled to recover from Waterfront the cost of "covering." The prices for which Waterfront sold **these containers** in those locations in 2012, CMA sold similar

5

used containers in those locations in 2012, and the prices set out in the Harrison Report for 2012 reflect the market price of "cover."

As the Ninth Circuit stated in *R.B. Matthews, Inc. v Transamerica Transportation Services, Inc.* 945 F.2d 269 (9th Cir. 1991) (breach of a contract for the sale of used trailers):

> The rules for measuring damages are very simple. When a seller breaches the contract, the buyer has two possible remedies. First, he may attempt to cover and obtain goods in substitution for those due from the seller. *See* Cal. Com. Code Ann. § 2711(1)(a) … If he covers, he can recover the difference between the cost of cover and the contract price together with any incidental or consequential damages. *Id.* § 2712(2).
>
> The buyer's second remedy is to recover the difference between the market price and the contract price. *Id.* § 2711, 2713. In this case the contract-market price differential is the difference between the market price of the unmodified trailers (the seller) agreed to provide (the buyer) and the contract price of those trailers.

945 F.2d at 274-75.

Applying §2713 and using Mr. Passal's opinions regarding the market prices of the three types of containers in 2012 ($1,515 for 20', $2,125 for 40' and $2,325 for 40'HC – See EXHIBIT 33 and 34, at page 4), minus the purchase option prices, results in damages due to CMA for the 4,590 returned containers of $4,041,910.

Alternatively, applying §2713 and using the average prices for which Waterfront actually sold 7006SF Lease containers in 2012 ($1,347 for 20', $1,897 for 40' and $2,125 for 40'HC – See EXHIBIT 27, "2012" column), minus the purchase option prices, results in damages due to CMA for the 4,590 returned containers of $3,158,290.

These two calculations are set out on EXHIBIT 31.  For ease of reference, a copy of EXHIBIT 31 is attached to this Post Trial Brief as "APPENDIX A."

### 3. Waterfront's Alternative Theories Regarding CMA's Damages

Waterfront made no effort to present evidence disputing Mr. Passal's testimony about 2012 market prices, nor the evidence upon which he based his opinions.  Indeed, Waterfront did no analysis at all of Waterfront's own 2012 sales of the subject containers, CMA's 2012 sales of similarly situated used containers, nor of the Harrison Report data.  Waterfront instead presented two completely different theories of how CMA's damages should be calculated.

Under Waterfront's "Alternative A," which is set out on trial EXHIBIT S. Waterfront simply asks the Court to reject Section 2713 altogether. Under Waterfront's "Alternative B," which is set out on trial EXHIBIT T, Waterfront concedes that California Commercial Code §2713 governs the measure of CMA's damages, but Waterfront proposes a complicated and legally and logically unsupported theory of what is meant by the "market price" under Section 2713.

#### i.   Waterfront's Rejection of §2713 Theory

Waterfront's "Alternative A" damage theory asks the Court to reject application of California Commercial Code Section 2713  altogether. Under this alternative theory, CMA would receive the average prices for which Waterfront sold the containers that were returned by CMA in 2012, 2013 and 2014 (through April), minus the purchase option prices.  Those average prices over the period of 2012 through April 2014 are significantly below the market prices for the containers in 2012, because the market prices of containers decreased significantly in 2013 and in 2014.  See EXHIBIT S.  This is obviously not the market price of the containers as of the time CMA learned of

7

Waterfront's repudiation of the sale; which is the measure of damages dictated by California Commercial Code Section 2713.

Waterfront's "Alternative A" asks the Court to ignore the law and to also ignore the fact that for each day that CMA retained the 4,590 containers, the Court has already ruled that CMA must pay the daily per diem rate to Waterfront for those containers. Thus Waterfront will receive daily compensation (or credit) for each day that CMA retained the 4,590 containers, plus the price for which Waterfront sold each container. If CMA is awarded only the average price for which Waterfront sold the returned containers over the period of 2012 through April 2014, CMA will be left in a much worse position than it would have been, had Waterfront not breached the purchase option provision, which is the sole reason why CMA was forced to return any of the containers.

Contrary to this alternative theory presented by Waterfront, California has long recognized that predictability and certainty in the law of contracts is essential to the smooth performance of contractual relations. California Commercial Code Section 2713 provides predictability and certainty for parties involved in a sale of goods. The seller knows that if it repudiates the sale, the measure of damages will be the difference between the then-existing market price and the agreed sale price. Waterfront's "Alternative A," if accepted, would erase that certainty, substituting whatever random market fluctuations might later occur in the price of the containers, for the market price existing at the time Waterfront made its decision to repudiate the sale.

As the court stated in *KGM Harvesting Company v. Fresh Network* (1995) 36 Cal.App.4th 376:

> The basic object of (contract) damages is that the party injured
> by the breach should receive as nearly as possible the equivalent
> of the benefits of performance (and such a system) furthers the

goal of 'predictability about the cost of contractual relationships … in our commercial system.'

36 Cal.App.4th at 382.

The California Supreme Court has emphasized that breach of contract remedies should operate "to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.

The rule proposed by Waterfront, that CMA's damages should depend upon the speed at which CMA returned the containers and the speed at which Waterfront sold the containers as they were returned, which is subject to market price fluctuations that have taken place since 2012, would provide no "predictability about the cost" of Waterfront's breach, nor enable either party to "estimate in advance the financial risks" associated with breaching the contract.  Waterfront would not have even suggested this alternative if the market price of containers had gone up as CMA was returning the containers and Waterfront was reselling them.

CMA respectfully asks the Court to reject Waterfront's invitation to ignore California law.

ii.   Waterfront's Market Price Theory

Under Waterfront's "Alternative B" damages theory, the "market price" of the subject containers at the time of the repudiation:  (1) should be measured by the price for which Waterfront's expert, Gary Sawka, contends CMA could have or would have resold all of the subject containers in a single transaction, entered into immediately following the repudiation and; (2) according to Mr. Sawka, such a sale would be for very low "fire sale" prices, compared to the prices for which the actual 7006SF Lease containers, and similar used containers, were selling in 2012. See Waterfront's EXHIBIT T.

9

According to Mr. Sawka, if CMA had to resell all of the containers in a single transaction, immediately following its purchase of the containers from Waterfront in May 2012, it could have or would have resold them for less than the prices that CMA had sold another group of containers to Transamerica Corporation ("TLA") under a sale and lease-back transaction in March of 2012. See Waterfront's EXHIBIT D. To reach his final opinion of the "market price" of the Waterfront containers under this theory, Mr. Sawka started with the sale prices in the TLA sale contract, and adjusted them downward, using a formula that has nothing to do with the actual market prices of containers in 2012. See Waterfront's EXHIBIT Q, pages 7-10 and EXHIBIT T, page 4.

CMA disagrees that it could only have resold the containers through the "fire sale" scenario painted by Mr. Sawka. Regardless, contrary to this theory proposed by Waterfront, there is nothing in the California Commercial Code that ties the definition of "market price" to the price for which the spurned buyer could have or would have resold the goods at issue. Indeed, the buyer's intentions do not even come into the equation.[5]

Furthermore, §2713 applies to the repudiation of a sale to any buyer, even buyers who have no experience or knowledge of how to resell the goods at issue. If "market price" was determined according to this theory proposed

---

[5] In its (Pre) Trial Brief, Waterfront cited *Allied Canners & Packers v. Victor Packing Company (1984) 162 Cal.App.3d 905* and *H-W-H Cattle Company v. Schroeder*, 767 F.2d 437 (8th Cir. 1985), as support for this theory that the "market price" is the price for which CMA could have or would have resold the containers in a sale and lease-back transaction or bulk sale. Those cases involved buyers who were middlemen, purchased the goods at issue for the sole purpose of reselling them, and had already entered into a resale contract of the goods at issue before the seller repudiated the sale to the middlemen. Under those unique circumstances, the respective courts ruled that the already contractually agreed resale prices of the goods being purchased by the middlemen should be considered to be the "market price" of those goods. CMA does not purchase containers for the sole purpose of reselling them, did not purchase these containers for the sole purpose of reselling them, and did not have a signed contract for the resale of these containers prior to Waterfront's repudiation of the purchase option. See testimony of Alexis Michel, R.T. 22:19-23:5; 28:24-29:11.

10

by Waterfront, the damages sustained by a spurned buyer would be limited to what that buyer could somehow prove it could have obtained by reselling the goods at issue, even if the buyer had no experience or knowledge of how to do that, and regardless of the actual "market price" of the goods.  Such a rule would be illogical and unfair.

Finally, the fallacy of this theory of "market price" was exposed by the testimony of Waterfront's President, Howard Hu, who admitted that, based upon his knowledge of the market prices of containers in the various locations where Waterfront sells containers, he sets a minimum "market price" which his sales people must follow when selling containers.  R.T. 163:5-164:9.  In other words, Waterfront in its own daily business practices recognizes that there is a "market price" of containers that is not based upon the "fire sale" theory presented by Mr. Sawka.  Waterfront in fact sold over 1,000 of these very 7006SF containers in 2012 based upon minimum "market prices" set by Mr. Hu.  The prices for which Waterfront sold these very containers under Mr. Hu's guidelines were far in excess of Mr. Sawka's testimony as to their market prices.[6]

**b.**     **The Containers that CMA Purchased from Waterfront**

Pursuant to the Court's ruling on December 13, 2013, that Waterfront should specifically perform the purchase option with regard to the still unreturned containers, CMA stopped returning the 7006SF Lease containers to Waterfront.  Two months later, on February 19, 2014, Waterfront issued an invoice to CMA in the amount of $2,509,550, representing the contractually agreed purchase option price attributable to the 2,590 containers still in

---

[6] Mr. Sawka testified that, in his opinion, under his alternative analysis, the "market price" of the subject containers in early 2012 was $1,230 for a 20' container, $1,551 for a 40' container and $1,888 for a 40'HC container.  See EXHIBIT Q, page 10.  All of these prices are hundreds of dollars lower than the prices for which Waterfront actually sold 7006SF Lease containers in 2012.  See EXHIBIT 27, column headed "2012," opposite "WCL."

CMA CGM, S.A.'s POST TRIAL BRIEF                                              Case No. C-12-5467-JSC

CMA's possession.  EXHIBIT 6.  A week later, on February 27, 2014, CMA paid that amount in full to Waterfront.  EXHIBIT 7.  CMA contends that with regard to those 2,590 containers, it suffered two elements of damages.

### 1.     Per Diem Attributable to the 2,590 Containers

A significant portion of the per diem claim being made by Waterfront under the 7006SF Lease is attributable to CMA's use, between May 1, 2012 and February 27, 2014, of the containers for which CMA paid the full contractual purchase option price on February 27, 2014.  The $2,509,550 purchase option price paid by CMA for those containers is the exact same amount that CMA would have paid for the same containers in early 2012, had Waterfront honored CMA's exercise of the purchase option.  Put another way, had Waterfront not breached the purchase option provision, CMA would have paid that same price, would have owned the 2,590 containers since early 2012 and, therefore, would not have paid any per diem for their use for the period between May 1, 2012 and February 27, 2014.

Thus, solely as a result of Waterfront's breach of the purchase option provision, it is seeking per diem from CMA for those 2,590 containers, in addition to having received $2,509,550 from CMA; the exact same amount Waterfront would have received back in 2012 under the purchase option. Either Waterfront is simply not entitled to the claimed per diem attributable to those 2,590 containers, or CMA is entitled to a dollar-for-dollar matching damage award, equal to the amount of per diem attributable to CMA's use of those 2,590 containers from May 1, 2012 to February 27, 2014.

The Court's Order dated May 31, 2013, in which the Court ruled that Waterfront was entitled to per diem for the days up to CMA's return of the containers to Waterfront, contemplated such an award to CMA:

> Awarding Waterfront an unconditional judgment on the per diem
> fees at this time could result in CMA simply paying a damages

12

amount that Waterfront, if found to have breached the option contract, would eventually be required to pay back in a similar amount. In other words, the parties' damages may offset.

Document 19, Court Order at 6:4-8.

The Court subsequently did find that Waterfront breached the option contract and, as a result, the Court then directed Waterfront to sell the remaining unreturned containers to CMA for the purchase option price. Waterfront should not receive the $2,509,550 purchase option price paid by CMA for the 2,590 containers, plus the per diem that accrued solely because Waterfront refused to sell the containers for that same price two years earlier, in breach of the 7006SF Lease contract.

The amount of per diem claimed by Waterfront that is attributable to the 2,590 containers is easy to calculate. Under both of Waterfront's alternative damages calculations, its calculation of per diem on the 2,590 containers starts on May 1, 2012 (CMA paid all per diem due through April 30, 2012) and ends on February 27, 2014, the date upon which CMA paid the purchase option price for the 2,590 containers that it had not returned as of that date. See EXHIBIT S, page 3 ("Note" number 1) and page 6 (item number 2 of listed items on that page); EXHIBIT T, page 3 ("Note" number 1) and page 6 (item number 2 of listed items on that page).

667 days passed between May 1, 2012 and February 27, 2014. On February 27, 2014, CMA bought from Waterfront 1,513 - 20' containers, 253 - 40' containers and 824 - 40'HC containers. See EXHIBITS 6 and 7. The per diem rates charged by Waterfront for those three kinds of containers are set out in the 7006SF Lease. See EXHIBIT 1, page 4 "Lease Rates." Those rates are 54 cents per day for 20' containers, $1.07 per day for 40' containers and $1.14 per day for 40'HC containers. The per diem charged by Waterfront that is attributable to the 2,590 containers for which CMA paid the purchase option price is simply the number of each type of container,

13

multiplied by the per diem rate for that type of container, multiplied by 667 days. CMA has done that calculation. It is attached to this Post Trial Brief as "Appendix B".

As shown on "Appendix B", the per diem charged by Waterfront that is attributable to the 2,590 containers for which CMA paid the purchase option price is $1,352,069.03.

Under both of Waterfront's alternative damages calculations, it is also seeking a total of $123,926 in interest on all per diem due, including the per diem attributable to the 2,590 containers that CMA purchased. See EXHIBIT S, page 3 (column "C" headed "Interest); EXHIBIT T, page 3 (column "C" headed "Interest"). Since the $1,352,069.03 in per diem that is attributable to the 2,590 containers is more than half of the total per diem claimed by Waterfront, any interest due to Waterfront in connection with per diem due should, conservatively, be reduced by half; by at least $61,963. "Appendix B" also includes a calculation of that reduction to Waterfront's interest on per diem claim.

In sum, as set out on "Appendix B" the amount of per diem attributable to the 2,590 containers, plus the conservative calculation of interest claimed by Waterfront in connection with those containers, is $1,414,032.03 ($1,352,069.03 + $61,963). If Waterfront is awarded all of the per diem and interest it has claimed, CMA should receive an award of $1,414,032.03 to offset the amount of per diem and interest due to Waterfront that is attributable to the 2,590 containers that CMA purchased on February 27, 2014. Alternatively, the award of per diem to Waterfront simply should not include $1,414,042.03 of the amount Waterfront has claimed.

14

## 2.    Loss of Value/Diminution

Between May 2012, when all of the containers should have been sold to CMA pursuant to the purchase option, and February 27, 2014, when Waterfront sold the remaining 2,590 of the containers to CMA (by Court Order), the value of the 2,590 containers dropped significantly.  Therefore, as a result of Waterfront's breach of contract, CMA has purchased containers whose market value is lower than the value of the containers that Waterfront was supposed to sell to CMA in 2012.

Since "the basic object of (contract) damages is that the party injured by the breach should receive as nearly as possible the equivalent of the benefits of performance ..." (*KGM Harvesting v. Fresh Network* (1995) 36 Cal.App.4[th] 376, 382), CMA should be awarded the market price differential between the higher market price of the containers in 2012 at the time of the breach and the market price of the containers as of the time of the sale of the containers to CMA in February 2014.

Using Mr. Passal's opinions regarding the market prices of the three types of containers in 2012 ($1,515 for 20', $2,125 for 40' and $2,325 for 40'HC – See EXHIBIT 33 and 34, at page 4), minus Mr. Passal's opinions of their values in February 2014 (see EXHIBIT 27, "February 2014" column, opposite "MICP," which is the name of Mr. Passal's consulting company), renders damages due to CMA for the reduction in the value of the 2,590 purchased containers of $949,124.

Alternatively, using the differential in the average prices that Waterfront actually obtained by selling the 7006SF Lease containers in 2012, minus the average prices that Waterfront actually obtained selling the 7006SF Lease containers in February 2014 (see EXHIBIT 27, "2012" column and "February 2014 column, opposite "WCL"), renders in damages due to CMA for the reduction in value of the 2,590 purchased containers of $1,449,853.

15

These two calculations are set out on EXHIBIT 30. For ease of reference, a copy of EXHIBIT 30 is attached to this Post Trial Brief as "APPENDIX C."

      c.    **Summary of CMA's Damages Not Including Interest**

For the returned containers (See "APPENDIX A"):

    $4,041,910 – Using Mr. Passal's 2012 Market Price Opinions, or;

    $3,158,290 – Using Waterfront's actual 2012 Sales Prices, plus;

For the purchased containers – per diem as damages (See "APPENDIX B"):

    $1,414,032.23[7], plus;

For the purchased containers – diminution in value (See "APPENDIX" C"):

    $949,124 – Using Mr. Passal's 2012 & 2014 Market Price Opinions, or;

    $1,449,853 – Using Waterfront's actual 2012 and 2014 Sales Prices.

CMA's total damages, minus the credit to which Waterfront is entitled is set out below, along with the prejudgment interest due to CMA on the net damages amount.

### III.    WATERFRONT'S CLAIMS

    a.    **Per Diem**

It appears that Waterfront applied payments made by CMA to the 7006SF Lease contract that CMA intended to be for the 5004SF Lease contract, resulting in CMA believing that it has fully paid all per diem due under the 5004SF Lease contract. Regardless, as can be seen from CMA's EXHIBIT 32, as compared to Waterfront's EXHIBIT S (at pages 2-3) and EXHIBIT T (at pages 2-3), CMA's calculation of per diem on the 7006SF Lease contract from May 1, 2012 to February 27, 2014 is slightly higher than

---

[7] Alternatively, as discussed above, if not awarded to CMA as damages to off-set Waterfront's claimed per diem, this amount should simply be deducted from Waterfront's recoverable per diem claim.

Waterfront's combined per diem claimed through that date for both the 7006SF Lease contract and the 5004SF Lease contract combined.

CMA will, therefore, stipulate to the total per diem calculation done by Waterfront, as well as the total loss figure claimed by Waterfront in connection with the 7006SF Lease contract and the drop-off, handling and total loss figures claimed by Waterfront in connection with the 5004SF Lease contract. EXHIBIT S, page 2 and 3; EXHIBIT T, page 2 and 3.

As discussed above, however, CMA does not agree that Waterfront is entitled to the per diem (and interest thereon) attributable to the 2,590 containers that CMA purchased from Waterfront on February 27, 2014 for the purchase option price of $2,509,550. As discussed above and set out on APPENDIX B, that per diem (and interest thereon) in the amount of $1,414,032.23, if awarded to Waterfront, should be offset by a dollar-for-dollar equal award back to CMA. Alternatively, that amount should simply be deducted from the amount of per diem due to Waterfront.

### b.   Reduced Market Price from CMA's Returns

In both of Waterfront's alternative damage calculations it has included a substantial monetary factor in its favor, based upon its contention that, after Waterfront breached the contract, forcing CMA to return the containers to Waterfront, CMA returned the containers too slow. Waterfront argues that, since the market price of containers fell in 2013 and 2014, had CMA returned the containers faster, Waterfront could have sold them for higher prevailing market prices.

In Waterfront's "Alternative A" damage calculation, this argument is factored into the equation by CMA receiving as damages only the average prices for which Waterfront has sold the returned containers in the falling market, over a two year period, through April of 2014, minus the purchase

option prices.  See EXHIBIT S.  In Waterfront's "Alternative B" damage calculation, this claim is factored into the equation by Waterfront receiving an actual affirmative damage award from CMA, calculated by the difference between Waterfront's average sales prices for the returned containers in 2012 minus its average sales prices for the returned containers during the period of January 2013 through April 2014.  See EXHIBIT T, page 5.

CMA strongly disputes that the falling price of containers as they were returned to Waterfront should be factored in any manner into the damages equation, because:

1.      Waterfront should not be heard to complain about a consequence that stemmed wholly from Waterfront's breach of the contract – CMA would not have been returning any containers, but for Waterfront's breach;

2.      The Court has ruled that CMA must pay rental fees (per diem) to Waterfront for each day until the containers were returned. Thus, Waterfront will be compensated by CMA at the contract rental rate for the period of time it took CMA to return the 4,590 containers, plus obtaining whatever price for which it then sold the returned containers;

3.      The fact that the market price of containers fell after Waterfront breached the contract was not caused by CMA and it is irrelevant to CMA's measure of damages under California Commercial Code Section 2713. The market price could have fallen, risen, or stayed the same after Waterfront breached the contract. Had the market price risen or stayed the same, Waterfront would not now be making any argument about the speed at which CMA returned the containers;

4.      After Waterfront's breach forced CMA to begin returning the containers, CMA had a legal duty to mitigate its damages and did so by returning containers to Waterfront when a container would, in the normal course of CMA's shipping business, circulate to a location where Waterfront had a return depot. As CMA's Mr. Michel testified, CMA did not incur the substantial expense of plucking Waterfront's containers from the 1.3 million containers in CMA's fleet, scattered around the globe, and make special shipments for Waterfront's containers to Waterfront's return depots. As a result, CMA is making no claim against Waterfront for "incidental and consequential damages" recoverable under California Commercial Code Sections 2713 and 2715. Had CMA instead made special arrangements to hunt down

18

1   Waterfront's containers and specially ship them directly to Waterfront's
2   return depots as quickly as possible, CMA would have a significant
claim against Waterfront for "incidental and consequential damages."
3   R.T. 32:17-36:8.[8]

4      In sum, the fact that the market price of containers decreased while

5   CMA was returning them to Waterfront should not result in Waterfront

6   receiving a financial benefit in the calculation of the net damages due to CMA.

7         **1.    Waterfront's "Conversion" Argument**

8      In its (Pre) Trial Brief, Waterfront argued that it is entitled to credit or

9   compensation attributable to the reduced market value of the containers that

10   were returned in 2013 and 2014, because CMA's use of the containers is akin

11   to a "conversion" of the containers by CMA.  Waterfront did not plead an

12   affirmative defense or cause of action for "conversion" in its answer to CMA's

13   complaint or in Waterfront's counter-claim and should not be allowed to make

14   such a new legal claim at this juncture.  Regardless, Waterfront's "conversion"

15   argument makes no sense.

16      As to the 4,590 containers that CMA returned to Waterfront, Waterfront

17   will receive per diem from CMA (or credit for per diem) until the day each

18   container was returned.  CMA is unaware of any reported case in which an

19   entity or person guilty of "conversion" has paid daily rental fees to the owner

20   of the converted goods.  An entity that is paying rental fees for the use of

21   goods cannot be found to have converted the goods during the rental period.

22      The Court ordered Waterfront to specifically perform the 7006SF Lease

23   purchase option with regard to remaining 2,590 containers.  It is illogical for

24

25

26   [8] CMA's Mr. Michel estimated that the cost of plucking an individual 7006SF Lease
container out of CMA's entire fleet, scattered all over the globe, and directing it to a
27   Waterfront return location would have been $300 to $400 per container. R.T. 32:17-36:8.
For 7,000 containers, this would cost in the range of $2,100,000 to $2,800,000. CMA
28   mitigated its damages, did not incur those costs, and is therefore not claiming those
damages from Waterfront.

CMA CGM, S.A.'s POST TRIAL BRIEF                  Case No. C-12-5467-JSC

Waterfront to seek a ruling that CMA illegally converted those 2,590 containers, for which it paid $2,509,550 to Waterfront.

### 2. Waterfront's Breach of Contract Argument

In its "Alternative B" damages calculation, Waterfront suggests that the decrease in the value of the returned containers should be treated as breach of contract damages, (see EXHIBIT 7, page 5), because CMA did not abide by the 6-month "Build Down Period" provision set out in the 7006SF Lease. EXHIBIT 1, page 5. In other words, Waterfront argues that, though Waterfront breached the 7006SF Lease contract, forcing CMA to return the containers to Waterfront, Waterfront may rely upon the 7006SF Lease contract with regard to the speed at which CMA's forced return of the containers should have occurred. Fortunately the law does allow such an inequitable result.

As the court noted in *Brown v. Grimes*, (2011) 192 Cal.App. 4th 265, 277-78: "(w)hen a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." Recent California U.S. District Court cases have applied *Brown* in the application of California law to breach of contract claims. *See Promex, LLC v. Hernandez* (C.D. CA 2011) 781 F.Supp.2d 1013, 1017; *Internet Brands, Inc. v. Ultimatecoupons.com, LLC* (C.D. CA 2013) 2013 U.S. Dist. LEXIS 74114, *3; *Imagenetix, Inc. v. Frutarom USA, Inc.* (S.D. CA 2013) 2013 U.S. Dist. LEXIS 173193, *24.

The result is no different under the California Commercial Code, which provide that "when either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may …. suspend his own performance…." Cal. U Com Code §2610. Waterfront cannot breach the

contract, forcing CMA to return the containers, then enforce the contract with regard to the forced return of the containers that its breach caused.

Additionally, Waterfront's breach of contract argument, like its "conversion" argument, ignores the fact that Waterfront will receive per diem (or credit therefor) for each day until CMA returned the 4,590 containers. Waterfront is not entitled to any additional compensation for CMA's use of those containers.

### 3.    Decrease in Value of Containers Sold to CMA

Waterfront may argue that its claim for credit or compensation attributable to the reduced market value of the containers that were returned in 2013 and 2014 is akin to CMA's claim for the diminution in value between 2012 and February 2014 of the 2,590 containers that CMA purchased on February 27, 2014.  However there are two significant differences between the two claims:  (1) CMA suffered the diminution in value damages as a result of Waterfront's breach of the contract and; (2) Waterfront will receive per diem (or credit therefor) for each day that CMA held each of the 4,590 containers until each was returned to Waterfront.  CMA, on the other hand, has not breached the contact and has received containers of a reduced value, two years later, for which CMA is receiving no compensation.

CMA believes, as discussed in Section II.b.2 above, that is entitled to damages for the diminution in value of the 2,590 containers that it purchased, (see also APPENDIX C) and, for the reasons discussed above, Waterfront is not entitled to any credit or compensation for the decrease in value of the 4,590 returned containers.  However, if the Court concludes that Waterfront is entitled to credit or compensation for the decrease in value of the 4,590 containers, (in either the form presented in Waterfront's "Alternative A" or "Alternative B" – EXHIBITS S and T), there would clearly be no basis upon

CMA CGM, S.A.'s POST TRIAL BRIEF                                        Case No. C-12-5467-JSC

which to deny CMA an award of the reduction in value damages for the 2,590 purchased containers.

## IV.   SUMMARY OF DAMAGES – THE NET/NET PLUS INTEREST

### a.   Using Expert Passal's Opinions

Using expert Roger Passal's opinions regarding the market price of the containers in early 2012 and their market price in February 2014 (as reflected on the top halves of APPENDIX A and APPENDIX C, which were trial EXHIBITS 30 and 31), CMA is entitled to gross damages, before Waterfront's offset of:

$4,041,910 (returned containers - top of "APPENDIX A") +

$1,414,032.23 (per diem and interest on returns – "APPENDIX B") +

$949,124 (reduced value of returns – top of "APPENDIX C)

Gross damages due to CMA = **$6,405,066.23**

### b.   Using Waterfront 2012 Sales Figures

Using Waterfront's actual average sale prices of the 7006SF Lease containers in 2012 and their sale prices in February 2014 (as reflected on the bottom halves of APPENDIX A and APPENDIX C, which were trial EXHIBITS 30 and 31), CMA is entitled to gross damages before Waterfront's offset of:

$3,158,290 (returned containers – bottom of "APPENDIX A") +

$1,414,032.23 (per diem and interest on returns – "APPENDIX B") +

$1,449,853 (reduced value of returns – bottom of "APPENDIX C) =

Gross damages due to CMA = **$6,022,175.23**

### c.   Waterfront's Offset

Under both of Waterfront's "Alternative A" and "Alternative B," it claims total per diem, interest and related costs for the 7006SF Lease and the 5004SF Lease, combined, of $2,749,091. See EXHIBIT S, pages 2-3;

22

EXHIBIT T, pages 2-3.  As noted above, CMA does not contest Waterfront's calculations.  This total, however, includes $1,414,032.03 in per diem and interest attributable to the 2,590 containers for which CMA paid the $2,509,550 purchase price to Waterfront on February 27, 2014.  Therefore, either CMA should be awarded $1,414,032.03 as an offset (as is included in the two alternative "gross damages" calculations above) or Waterfront's per diem and interest amount should simply be reduced by $1,414,032.03, in which case CMA's "gross damages" will not include this amount.

### d.    Net Damages

Placing the offsetting $1,414,032.03 on each party's side of the ledger for the sake of simplicity, the net damages due to CMA are:

Using expert Passal's figures: **$3,655,975.23**

($6,405,066.23 - $2,749,091).

Using Waterfront's 2012 sales figures: **$3,273,084.23**

($6,022,175.23 - $2,749,091).[9]

### e.    Prejudgment Interest

The parties agree that California law applies to a claim for prejudgment interest.  Under California Civil Code §3287(a) "a person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled to recover interest thereon from that day…."  Cal. Civ. Code §3287(a).  As this Court noted in its December 13, 2013, Order Re: Cross Motions for Summary Judgment ("December 13, 2013, Order"):

> Under this provision, prejudgment interest is allowable where the amount due plaintiff is fixed by the terms of the contract, or is readily ascertainable by reference to well-established market

---

[9] If, instead, CMA's claim does not include the $1,414,032.03 in per diem and interest as "damages" and Waterfront's per diem and interest is simply reduced by that amount, the net totals are the same.

values. On the other hand, interest is not allowable where the amount of damages depends upon a judicial determination based on conflicting evidence. Further, '[a]ny legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before.' *Id.* at §3289(a).

\* \* \*

The parties agree that only the party with the greater amount of damages may collect prejudgment interest under California law…. Such prejudgment interest, however, may be collected on only the amount remaining after the damages of the party with the greater claim are offset; that is, 'only the balance bears interest'… ("[O]ffsets of the defendant, even where unliquidated, do not preclude the allowance of interest *on the balance* of the plaintiff's claim.").… Thus, the Court must determine the precise damages amount for both CMA and Waterfront.

December 13, 2013, Order at 7:14-8:10. Citations omitted.

With the conclusion of trial the Court now has sufficient evidence to determine the "precise damages amount for both CMA and Waterfront." As set out above (see Section d.) the net damages due to CMA using expert Passal's figures are $3,655,975.23 or, if the Court chooses to use Waterfront's 2012 sales figures, $3,273,084.23. It is that net amount in favor of CMA which bears pre-judgment interest. California Civil Code §3289 provides that:

> (a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.

> (b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach.

The 7006SF Lease, typed Clause 16, printed Clause 10 provides for interest at rate of 1.5% per month (18% per year). Had the contract been silent on interest a 10% rate would be proper per §3289(b). For purposes of CMA's interest calculation CMA assumes entry of judgment on August 31, 2014 or 31 months after Waterfront's breach of contract on January 31, 2012.

24

To calculate prejudgment interest on $3,655,975.23 at 1.5% simple interest per month for 31 months:

$$I = P \times r \times t$$

- **P** is the principal amount, $3,655,975.23.
- **r** is the interest rate, 1.5% per month, or in decimal form, 1.5/100=0.015.
- **t** is the time involved, 31 months.

Multiplying $3,655,975.23 × 0.015 × 31 = $1,700,028.48 in prejudgment interest. Should the Court instead employ Waterfront's 2012 sales figures, prejudgment interest would be $1,521,984.17 ($3,273,084.23 x 0.015 x 31).

Waterfront may contend that CMA's damages were too uncertain to permit prejudgment interest under Civil Code § 3287(a). However, this is not the law. "The fact that proof of the market value of goods is required to establish the amount of a claim does not render it incapable of being made certain by calculation, so as to prevent the allowance of interest...." *Bare v. Richman & Samuels, Inc.* (1943) 60 Cal.App. 2d 413, 420. In *Bare*, the contract provided for payment for the sale of grapes at the market value "f.o.b. Turlock." After the *Bare* court determined the market value of the grapes at that time and in that location to be $27.50 per ton, "the condition upon which interest may be allowed" had been met. *Id. See also, Howe v. City Title Insurance Co.*, (1967) 255 Cal.App. 2d 85, 88.

Even if CMA's contract damages where "unliquidated," prejudgment interest could be awarded "from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." If the date the complaint was filed (October 23, 2012), was used to compute prejudgment interest, through an August 23, 2014 entry of judgment for calculation purposes, Waterfront would owe 22 months' worth of prejudgment interest. Utilizing the same prejudgment interest formula as

CMA CGM, S.A.'s POST TRIAL BRIEF

Case No. C-12-5467-JSC

above, Waterfront would owe $1,206,471.83 in prejudgment interest based upon expert Passal's figures ($3,655,975.23 x 0.015 x 22) or $1,080,117.79 ($3,273,084.23 x 0.015 x 22), based upon the Waterfront's 2012 container sales prices.

## V.   CONCLUSION

As set out in California Commercial Code Section 1305:

**§ 1305. Remedies to be liberally administered.**

(a) The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed …

Unlike Waterfront, CMA is not asking the Court to ignore applicable California law with regard to the repudiation by the seller of a sales contract, nor to adopt an elaborate damage theory that ignores the actual facts as to the existing market price of containers at the time relevant to this case.. CMA is asking for nothing more than to be placed, as nearly as possible, in the position it would have been in, had Waterfront not breached the 7006SF Lease contract.

Respectfully submitted.

Dated: July 14, 2014

COX, WOOTTON, LERNER, GRIFFIN, HANSEN & POULOS, LLP
Attorneys for Plaintiff and Counter Defendant CMA CGM, S.A.

By: /s/ _____
Mitchell S. Griffin

26