Emard Danoff Port Tamulski & Walovich LLP
Eric Danoff (60915)
Katharine Essick (219426)
49 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone:     (415) 227-9455
Facsimile:     (415) 227-4255
E-Mail:        edanoff@edptlaw.com
E-Mail:        kessick@edptlaw.com

Attorneys for Defendant and Counterclaimant
Waterfront Container Leasing Co., Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CMA CGM, S.A.,<br><br>            Plaintiff,<br><br>      vs.<br><br>WATERFRONT CONTAINER LEASING COMPANY, INC.,<br><br>            Defendants.<br><hr>AND RELATED COUNTERCLAIM | Case No.:  C-12-05467-JSC<br><br>**POST-TRIAL BRIEF BY DEFENDANT AND COUNTERCLAIMANT WATERFRONT CONTAINER LEASING COMPANY**<br><br>Trial Dates: June 23-24, 2014<br>Court: Magistrate Judge Jacqueline Corley |

        Waterfront Container Leasing Co. ("Waterfront") submits its Post-Trial Brief.

Dated:  July 14, 2014          EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
                               Eric Danoff
                               Katharine Essick

                               By_____/s/ Eric Danoff_____
                               Attorneys for Defendant and Counterclaimant
                               Waterfront Container Leasing Co., Inc.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

# TABLE OF CONTENTS

Issues Presented...............................................................................................................1

I.     Statement of Facts. .................................................................................................2

       A.     The Lease Agreements. .................................................................................2

       B.     Events Following the Termination of the Leases..........................................3

       C.     The Court's Rulings on Motions. ..................................................................4

II.    CMA owes Waterfront damages for charges under Lease 5004 and Lease 7006...........4

       A.     CMA owes Waterfront $213,637 for charges under Lease 5004......................4

       B.     CMA owes Waterfront $2,589,647 for charges under Lease 7006....................4

III.   Waterfront owes CMA damages for the difference between the market prices
       of the containers and the purchase option prices .............................................6

       A.     If market value is determined by actual sales of the containers on the
              open market, Waterfront owes CMA $1,349,546 ................................................9

       B.     If market price is determined as of May 2012, then the price should be
              based on the CMA/TAL sale/leaseback, appropriately adjusted, and
              Waterfront owes CMA $1,914,966. ..................................................................11

              1.     For a sale/leaseback in May 2012 the difference between the
                     fair market sales prices and the purchase options prices
                     totals $3,494,256. ..........................................................................11

              2.     CMA owes Waterfront $1,579,290 for failure to timely return
                     the containers...................................................................................14

IV.    Summary of Damages Calculations .................................................................19

V.     Conclusion.....................................................................................................19

POST-TRIAL BRIEF BY WATERFRONT
 Case No.:  C-12-05467-JSC

# TABLE OF AUTHORITIES

**CASES**

*Allied Canners & Packers v. Victor Packing Co.*
(1984) 162 Cal. App. 3d 905, 209 Cal. Rptr. 60 .............................. 12

*Applied Equipment Corp. v. Litton Saudi Arabia*
(1994) 7 Cal. 4th 503, 869 P.2d 454, 28 Cal. Rptr. 2d 475 ........................... 6

*Brower v. Rohweder*
(Bankr. D.N.D. 1988) 104 B.R. 226 .............................. 10

*Burlesci v. Peterson*
(1998) 68 Cal. App. 4th 1062, 80 Cal. Rptr. 2d 704 ........................... 16

*Edwards v. Jenkins*
(1932) 214 Cal. 713, 7 P.2d 702 .............................. 16, 17

*Enterprise Leasing Corp. v. Shugart*
(1991) 231 Cal. App. 737, 282 Cal. Rptr. 620 .......................... 16, 17

*Gruber v. Pac. States Sav. & Loan Co.*
(1939) 13 Cal. 2d 144, 88 P.2d 137 .......................... 16, 17

*H-W-H Cattle Co. v. Schroeder*
(8th Cir. 1985) 767 F.2d 437 .............................. 12

*In re Excello Press, Inc.*
(7th Cir. 1989) 890 F.2d 896 .............................. 10

*Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan*
(2005) 129 Cal. App. 4th 692, 28 Cal. Rptr. 3d 815 .......................... 16, 17

*KGM Harvesting Co. v. Fresh Network*
(1995) 36 Cal. App. 4th 376, 42 Cal. Rptr. 2d 286 ........................... 7

*Los Angeles Federal Credit Union v. Madatyan*
(2012) 209 Cal. App. 4th 1383, 147 Cal. Rptr. 768 ........................... 16

*Messerall v. Fulwider*
(1988) 199 Cal. App. 3d 1324, 245 Cal Rptr. 548 ........................... 17

*Poggi v. Scott*
(1914) 167 Cal. 372, 139 P. 815 .............................. 16

*R.B. Matthews, Inc. v. Transamerica Transp. Services*
(9th Cir. 1991) 945 F.2d 269 .............................. 7

*Schroeder v. Auto Driveaway Co.*
(1974) 11 Cal. 3d 908, 523 P.2d 662 .......................... 17

*Tyrone Pacific International v. MV Eurychili*
(9th Cir. 1981) 658 F.2d 664 .............................. 17

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

- ii -

*UAW v. NLRB*
(D.C. Cir. 1972) 459 F.2d 1329 ..................................................................................... 13

**STATUTES AND RULES**

California Civil Code

§3336 ...................................................................................................................... 17


California Commercial Code

Division 2 ................................................................................................................. 6

Division 10 ............................................................................................................... 6

§1305(a) ............................................................................................................. 7, 12

§2712 .................................................................................................................... 7, 8

§2713 ............................................................................................................. 6, *passim*

§2723 ........................................................................................................................ 7

§10201(d)(3) .......................................................................................................... 15


Federal Rules of Civil Procedure

Rule 26(a)(1)(A)(iii) ............................................................................................... 19

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

**Issues Presented**

The issues for trial were to determine the amount of damages that CMA CGM, S.A. ("CMA") owes to Waterfront, and the amount of damages that Waterfront owes to CMA.

CMA owes damages to Waterfront under Leases 5004 and 7006 for contractual rental and other charges due.

Waterfront owes damages to CMA for failure to consummate the Lease 7006 purchase option.  Under California law, including the California Commercial Code, damages are to put the parties in the same financial position as if the breach had not occurred.  In this case damages should be based on the difference between the value of the containers when the purchase option was to take effect on May 1, 2012, and the purchase option prices.  When the purchase option was to take effect the containers were in use, scattered all over the world, and unavailable for sale.  When they became available for sale CMA presumably redelivered them to Waterfront, which promptly sold them.  Thus the market price should be determined when Waterfront sold the containers.  The best evidence of market price is the actual sales prices obtained, not the theoretical prices CMA argues for.  Waterfront's Exhibit S set forth the damages calculations under that scenario.  Waterfront attaches to this Brief Attachment 1, which is an update of the figures in Exhibit S to include interest through July 31, 2014.

CMA argues that the market price of the Lease 7006 containers should be determined as of May 2012, when title would have passed to CMA, even though the containers were not available for sale on the open market then.  CMA then inconsistently argues that the Court should not apply the figures that a bulk sale in May 2012 would have generated, because such a sale would have yielded a low return, but instead should use prices CMA theoretically could have obtained if the containers had been sold over the next six months.  If the Court concludes that the price in May 2012 governs, then that price should be based on a sale/leaseback transaction, which is the only feasible way that CMA could have sold the containers in May 2012.  Indeed, CMA stated that it was going to include the Waterfront containers in a sale/leaseback with TAL if the purchase option had been consummated.  The sale prices in that sale/leaseback transaction have to be adjusted, however, because they were artificially high.  In

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 1 -

POST-TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

addition, under any scenario using market prices in May 2012 Waterfront is entitled to damages from CMA for its failure to return the containers when due by October 31, 2012, because the delayed return during a falling market for used containers damaged Waterfront. Waterfront's Exhibit T sets forth the damages calculations under that scenario. Waterfront attaches to this Brief Attachment 2, which is an update of the figures in Exhibit T to include interest through July 31, 2014.

## I.     Statement of Facts.

### A.     The Lease Agreements.

Waterfront is a California corporation based in San Francisco and is in the business of leasing out intermodal cargo containers. CMA is a large French corporation based in Marseille that operates oceangoing ships that carry cargo, and for that purpose CMA both owns and leases in intermodal cargo containers.

Before 2007 Waterfront had leased thousands of containers to a company called Cheng Lie Navigation, which was based in Taiwan. CMA acquired Cheng Lie in about March 2007 and thereby assumed the leases and took possession of the containers. Shortly thereafter Waterfront and CMA renegotiated and consolidated some of the container lease agreements that Waterfront had with Cheng Lie. One of the renegotiated leases was for 7,271 containers under Term Lease Agreement No. T07006SF ("Lease 7006"). (Exhibit A.) The term of Lease 7006 was for a minimum of five years beginning May 1, 2007. (Lease 7006, typed Clause 6.) CMA also became the successor lessee under Long Term Lease Agreement No. T05004SF ("Lease 5004"), and that lease was not renegotiated. (Exhibit B; Hu, 148:17-149:8.)

Lease 7006 contains an option for CMA to purchase the containers at the end of the lease for specified prices: $750 for a 20' container; $1200 for a 40' container; and $1300 for a 40' foot high cube ("40HC") container. (Lease 7006, typed Clause 2.) Although notice of intent to exercise the purchase option had to be given at least 60 days before the end of the lease term, the actual sale would take place at the end of the lease (April 30, 2012), assuming that CMA had paid the purchase option price and had paid all rental charges then due. (Lease 7006, typed Clause 2.)

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

Lease 5004 does not contain a purchase option. (Exhibit B; Kumar, 184:8-184:9.)

Both Leases state that California state law governs. (Lease 7006, typed Clause 27 and printed Clause 16(e); Lease 5004, printed Clause 16(e).)

On January 30, 2012, CMA wrote Waterfront stating that it intended to exercise the purchase option under Lease 7006. (Exhibit 3.) The next day Waterfront responded that the purchase option was void because CMA had been in default and continued to be in default under Lease 7006 for failure to pay the rental (per diem) charges and other amounts owed. (Exhibit 4.)

Lease 7006 ended on April 30, 2012. Waterfront gave formal notice to CMA on May 8, 2012, that CMA was in default of Lease 7006, Lease 5004, and all other leases, which therefore were terminated, subject to Waterfront's rights and remedies under the leases, and Waterfront demanded return of the containers. (Exhibit E; Kumar, 177:6-177:24; Michel, 48:23-49:10.)

**B.     Events Following the Termination of the Leases.**

In an attempt to resolve the dispute about the validity or not of the purchase option in Lease 7006, CMA and Waterfront attended a private mediation at JAMS in San Francisco on July 20, 2012. The mediation failed to resolve the dispute. At the conclusion of the mediation CMA (through Alexis Michel, the CMA Vice President in charge of container leases) and Waterfront signed the following agreement: "While the parties did not reach an agreement on which they could settle their dispute, CMA has agreed, in response to Waterfront's demand, to return the leased containers as soon as reasonably practicable to do so, and CMA will begin this process by Monday, July 23, 2012." (Exhibit F; Hu, 151:12-152:6; Michel, 32:11-32:19, 51:3-51:15.)

CMA sporadically returned 4,590 of the containers under Lease 7006 from August 2012 through January 2014. Waterfront sold those containers as and where CMA returned them. The parties agree that Waterfront received fair market prices for the containers CMA had redelivered. (Hu, 162:20-162:25; Exhibit N, p.2; Exhibit O, p.3.)

As of February 19, 2014, CMA retained 2,590 containers, which Waterfront invoiced to CMA at the purchase option prices. (Exhibit G.) CMA paid the purchase option prices, totaling $2,509,550, for those containers on February 27, 2014. (Exhibits H, 8.) CMA did not pay

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

Waterfront the purchase price for any containers that CMA returned.

### C. The Court's Rulings on Motions.

CMA filed suit on October 23, 2012. Waterfront counterclaimed on December 11, 2012.

The parties submitted several motions for partial summary judgment. On May 31, 2013, the Court issued its Order (Dkt. No. 19) ruling that under Lease 7006 CMA is required to pay Waterfront rental fees until the containers are returned notwithstanding the dispute over the purchase option. (Dkt. No. 19 at 4:1-5; 5:21-22.) The Court concluded that CMA's exercise of the purchase option would not have extinguished the lease agreement and the lessor-lessee relationship between the parties, but would merely have created a separate bilateral sale contract, with Waterfront as vendor and CMA as vendee. (*Id.*, at 5:17-20.) On October 15, 2013, the Court issued its Order (Dkt. No. 35) ruling that CMA had a valid purchase option under Lease 7006 and that Waterfront breached that option by not issuing an invoice to CMA for the exercise of it. On December 13, 2013, the Court issued its Order (Dkt. No. 50) ruling that: (a) for the containers CMA had failed to return under Lease 7006 as of that date Waterfront was entitled to the purchase option prices rather than the Fixed Replacement Charges; (b) for the containers CMA had failed to return under Lease 7006 as of that date CMA was entitled to retain them in return for payment of the purchase option prices (rather than be required to return them to Waterfront); and (c) Waterfront was entitled to certain prejudgment interest.

## II. CMA owes Waterfront damages for charges under Lease 5004 and Lease 7006.

### A. CMA owes Waterfront $213,637 for charges under Lease 5004.

The damages CMA owes to Waterfront under Lease 5004 are straightforward because that lease contained no purchase option and because CMA has not asserted that Waterfront violated that lease. Under Lease 5004 CMA owes contractual rental, drop-off, handling, repair, and total loss charges, plus interest. The amounts for these total $213,637. (Attachment 1 and Exhibit S, page 2.)

### B. CMA owes Waterfront $2,589,647 for charges under Lease 7006.

Under Lease 7006 CMA owes rental charges. Waterfront billed CMA the rental for each returned container until CMA redelivered it, and billed the rental for the unreturned containers

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

until CMA paid the purchase option prices on February 27, 2014. CMA used the containers during these periods, without paying anything for them.

CMA apparently will argue that for the unreturned containers CMA purchased in February 2014, Waterfront should not be entitled to rental charges as well as the purchase option prices, but that argument is fallacious. The Court has ruled that Waterfront is entitled to rental charges until CMA returns the containers. (Dkt. No. 19, May 31, 2013.) CMA should have returned those containers long before February 2014, as is discussed below, and CMA should not be allowed to escape its obligation to pay rental charges by defaulting in its obligation to return the containers. Also, CMA used the unreturned containers from the end of the lease on April 30, 2012, through February 27, 2014, without having paid for them. If CMA had returned the containers it would have had to buy or lease other containers to replace them (Michel, 57:6-57:13), which costs CMA saved by not returning them. CMA should not be allowed to fail to return the containers, use the containers for free without paying the purchase prices, and then also not pay a rental charge for their use. Conversely, if CMA had returned the containers Waterfront could have leased them out or sold them and used the proceeds to buy and lease out other containers, so it would be inequitable to deprive Waterfront of both the purchase prices and the rental charges until February 2014.

CMA apparently also will argue that for the unreturned containers CMA purchased in February 2014, rental charges should stop as of December 13, 2013, when the Court ruled that for the containers CMA still retained by that date, CMA was entitled to keep them in return for payment of the purchase option prices. As of February 19, 2014, CMA retained 2,590 containers, which (pursuant to the Court's Order) Waterfront invoiced to CMA at the purchase option prices (Exhibit G), which CMA paid on February 27, 2014. (Exhibits H, 8.) Waterfront did not issue an invoice earlier because CMA kept returning containers through January 2014, and thus it was impossible to know how many containers to invoice. (Hu, 157:23-158:3.) In any event CMA knew how many containers it had returned on any given date and what the purchase option prices were. CMA could have stopped the rental charges on any or all of the containers it retained by paying Waterfront for them at any time after December 13, 2013; CMA did not need

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

an invoice from Waterfront to know how much to pay for the retained containers. Of course CMA also could have stopped rental charges from running on any container at any time by redelivering it.

Under Lease 7006 CMA owes damages for 11 total loss containers at the contractual Fixed Replacement Charge. These are for containers that CMA had declared were total losses but which CMA did not pay for. This item is not for containers that CMA failed to return following termination of the lease due to the purchase option dispute.

CMA has not paid the rental or other charges billed, and by contract CMA owes interest on that. Waterfront is entitled to interest at the Lease 7006 contract rate on these unpaid amounts. (Lease 7006, typed Clause 16, printed Clause 10.)

The amounts due for Lease 7006 rental, total loss, and interest charges total $2,589,647. (Attachment 2 and Exhibit S, p. 3.)

**III.    Waterfront owes CMA damages for the difference between the market prices of the containers and the purchase option prices.**

CMA did not buy containers to replace the ones that Waterfront failed to sell to it under the purchase option, that is, CMA did not "cover." (Michel, 64:5-64:16.) Instead CMA continued to use the Waterfront containers after the termination of the lease on May 1, 2012. CMA sporadically returned containers to Waterfront, primarily over the period August 2012 through January 2014. By the end of January 2014 CMA had redelivered 4,590 containers to Waterfront.

The California Commercial Code ("CUCC"), Division 2 (Sales), including §2713, generally applies to the breach of a sales contract. CUCC Division 10, concerning leases, may be more applicable to the issues at bar, and Division 10 does not have an equivalent to CUCC §2713, so common law contractual damages rules would apply. The overriding principle of damages in both Divisions, however, is the same: to put the parties as nearly as possible in the same financial position as if the contract had been performed. CMA's Trial Brief relied on the California Supreme Court case *Applied Equipment Corp. vs Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503, 515, 869 P.2d 454, 28 Cal. Rptr. 2d 475 as establishing the proper measure of

damages, and that case stated: "Contract damages seek to approximate the agreed-upon performance. '[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.' [Citations omitted.]" The California Commercial Code does not differ. CUCC §1305(a) states that the overriding principle of damages under the CUCC is that the damaged party should be put into as good a financial position as it would have been if the breach had not occurred.

Though CUCC §2713 calls for damages in the amount of the difference between the "market price" of the containers and the contract price at the time of the breach, that section cannot be read in isolation but must, of course, be interpreted in accordance with other relevant provisions of the Commercial Code and with case law. CUCC §2723, for instance, states that if evidence of market price at the time of the breach is not "readily available," the price prevailing within a reasonable time before or after the breach may be used.

In the usual case decided under §2713 the seller fails to deliver the goods. The present case is unusual because CMA had the containers in its possession at the time of the breach, and they were not available for resale by CMA because they were in use and scattered all over the world. There is no index of sale prices for used containers or other "readily available" pricing guide. Waterfront has found no precedent applying §2713 to a case like this one. What "market price" means under these circumstances, and when and how it should be measured, is an open question.

The cases CMA cited in its Trial Brief on what measure of damages to apply are inapplicable. *KGM Harvesting Co. vs. Fresh Network* (1995) 36 Cal. App. 4th 376, 42 Cal. Rptr. 2d 286 addresses damages to the buyer when it covers under CUCC §2712, but CMA did not cover. In *R.B. Matthews, Inc. v Transamerica Transp. Services* (9th Cir. 1991) 945 F.2d 269 the seller failed to deliver the contracted for quantity of trailers. The buyer sought consequential damages in the form of lost profits from the expected resale of the trailers. The court noted that if the buyer could have covered but chose not to do so, then he cannot recover such consequential damages under CUCC §2713, but the buyer could recover those damages if it actually covered or reasonably tried to cover but failed. *Id.* at 275. The court could not tell from

- 7 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

the record whether the buyer had the opportunity to cover, and thus the court could not determine whether the buyer was entitled to consequential damages under CUCC §2712. *Id.* at 275-6. Since CMA did not cover or attempt to cover, those cases have no application to CMA's claim, which is for market price differential under CUCC §2713, not for cover damages.

The parties agree that the values of the containers exceeded the purchase option prices on May 1, 2012, and thereafter. Waterfront submits that the proper measure of damages is what CMA could have sold the containers for if the purchase option had been concluded. In that way CMA would be put in as good a financial position as if the breach of the purchase option had not occurred. The best evidence of when CMA could have made those sales and for how much is the history of when those sales did take place and for how much, that is, the history of when CMA stopped using the containers and redelivered them and the amount for which Waterfront then sold them. That is described in Section A below.

CMA argues that the market price should be measured at the time of the breach, which would be May 1, 2012. There are two ways CMA could have sold the containers in May 2012. One is by a bulk sale on the open market, but the parties agree that such a sale would yield a low price. (Exhibit Q; Passal, 112:23-113:3.) The other way is by a sale/leaseback. The best evidence of container values under a sale/leaseback scenario in May 2012 would be the prices in the prospective sale to TAL, adjusted to fair market value. That is described in Section B below.

CMA, on the other hand, wants to have its cake and eat it too. CMA initially requested a theoretical and high market price from May 2012, but CMA's witnesses admit that these containers in fact (given their volume, use, and locations) had no viable sales prospects then. So CMA apparently now wants the market price it asserts it could have obtained assuming it sold the containers over a six month or so period, to the end of 2012. That contradicts CMA's argument that the price should be determined under CUCC §2713 "at the time of the breach." At the time of the breach in May 2012 the containers had a low realistic market price in any actual sales scenario.

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

**A.    If market value is determined by actual sales of the containers on the open market, Waterfront owes CMA $1,349,546.**

At the end of the lease on April 30, 2012, the containers were in use and were scattered all over the world.  (Michel, 27:13-27:23, 51:16-51:18.)  CMA could not say when or where they would be available to the buyer, and the buyer would have no opportunity to inspect their condition.  Under such circumstances the "market value" of the containers in an attempted bulk sale of them on May 1, 2012, was low: $750 for a 20' unit, $930 for a 40' unit, and $1,175 for a 40HC unit.  (Exhibit Q, pp. 2-6; Sawka, 229:7-231:6.)  A literal application of CUCC §2713 therefore would yield a result that CMA would strongly reject.

If CMA had been allowed to exercise the purchase option, CMA would have done essentially what it in fact did: use the containers as needed, and then when not needed make them available for sale on the open market.  If CMA had exercised the purchase option, CMA was not going to resell the containers but was going to use them until they were about 13 years old and then sell them.  (Michel, 61:16-61:23.)  Following May 1, 2012, CMA did use the containers in its normal operations, until redelivering some of them.  Waterfront in turn sold the redelivered containers on average about two months after CMA redelivered them.

The price of used containers varies based on several factors: the size of the container, type of the container, location of the container, condition of the container, the sales terms (warranted as to condition or "as is"), the volume of containers sold (large volumes are generally sold at a volume discount), and most importantly the supply and demand of the local market when and where the container is sold.  CMA has admitted that Waterfront sold the containers for fair market values after CMA redelivered them.  Indeed, Waterfront sold its own containers along with the ones that CMA returned, so Waterfront had every incentive to obtain the best possible prices.  Thus the best evidence of what CMA could have sold the containers for is what Waterfront in fact sold them for.

No case under CUCC §2713 applies general market prices to circumstances like these.  The price that counts in this case is the market price of these particular containers, not some abstract containers in other locations, in different condition, or sold under different sales terms.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

The market price of a 2010 Chevrolet Impala sitting in a showroom in San Francisco in May 2012 differs from the market price of a 2010 Chevrolet Impala en route from Djibouti to Mombasa in May 2012. It may be the same make of car on the same date, but its location, availability, condition, and the local sales market drive the price. CMA is not entitled to the value of generic containers but to the value of the actual containers that were the subject of the purchase option. CMA could not have sold those containers until they were available for sale, which presumably was when and where CMA returned them to Waterfront.

CMA has admitted that Waterfront obtained fair market value prices when selling the containers CMA redelivered. (Exhibit N, p.2; Exhibit O, p.3.) That is the best evidence of the market value of those containers since the prices reflect the value of each container in its actual condition in its actual location in the actual market at the time when it was available for sale. In determining fair market value in a different context, establishing the amount of a deficiency under the Uniform Commercial Code following the sale of secured property, one court noted the compelling evidentiary effect of a commercially reasonable sale: "If despite the lack of notice the sale was commercially reasonable, the price is more than merely informative. The product of a commercially reasonable sale *is* the fair market value…The price obtained in a commercially reasonable sale is not *evidence* of the market value, which can be discounted or thrown out. It *is* the market value." (Italics in original.) *In re Excello Press, Inc.* (7th Cir. 1989) 890 F.2d 896, 904-905. See also *Brower v. Rohweder* (Bankr. D.N.D. 1988) 104 B.R. 226, 229 (actual price received is the best evidence of market price).

The prices Waterfront received for the containers CMA returned, and the difference between those prices and the purchase option prices, are shown in Exhibit S, p. 4. The spreadsheet showing the actual sales data is Exhibit J. (Kumar, 180:6-181:13.) The differential between the actual sale prices and the purchase option prices totals $1,349,546. (Exhibit S, p.4; Kumar, 191:24-195:5.) That is the proper measure of CMA's damages.

The Court should reject Passal's opinions about the theoretical prices that he posits CMA could have obtained if selling the Waterfront containers. His opinions are based on assumptions and speculations. He bases his opinions to a significant extent on the Harrison report, but

- 10 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

Harrison does not disclose the sources of its information on prices for used container sales, the volumes of the sales, or any particulars about the sales. (Passal, 124:3-124:17; 136:4-136:10.) He acknowledges that the Waterfront sales prices were commercially reasonable (Passal, 127:20-127:23), but he then proceeds to speculate that CMA could have sold them for more. Passal, who has not been directly involved in used container sales for decades, claims to have "checked" his estimates with more knowledgeable industry personnel, but his "checking" consisted of orally asking them in casual conversations for an off the cuff opinion about whether his estimates were "in the ballpark," without having provided them any details about the containers. (Passal, 130:9-132:21.) Even though CMA's actual used container sales prices in 2012 for all three sizes of containers were significantly below the average prices in the Harrison report (Passal, 135:19-137:2; Exhibit 27), Passal nevertheless opines that CMA could have sold the Waterfront containers for prices well above the average prices in the Harrison report. Passal bases this opinion in part on the average age of the containers CMA sold (about 15 years), but used 11 year old containers and used 15 year old containers fetch about the same prices because both are generally sold for storage rather than for carrying cargo. (Hu, 155:11-155:21.) Eventually, however, even Passal agreed that assuming a good faith sale, the value of a used container is best determined by what it actually sells for. (Passal, 140:19-140:23.)

Thus the best evidence of the loss to CMA is the differential between the purchase option prices and the amounts for which Waterfront sold the containers, and the total of that differential is $1,349,546.

**B.    If market price is determined as of May 2012, then the price should be based on the CMA/TAL sale/leaseback, appropriately adjusted, and Waterfront owes CMA $1,914,966.**

**1.    For a sale/leaseback in May 2012 the difference between the fair market sales prices and the purchase option prices totals $3,494,256.**

If the Court applies a measure of damages based on assumed market prices as of May 2012, then those damages should be based on the CMA/TAL sale/leaseback transaction. That was the only viable sales prospect in May 2012. Because the sales prices in that transaction appear to be inflated, however, they should be adjusted down to fair market value.

- 11 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

Under the Commercial Code, when a seller breaches by failing to deliver and the buyer has entered into a resale contract for the goods, the buyer's damages are measured by the resale price. In *Allied Canners & Packers v. Victor Packing Company* (1984) 162 Cal. App. 3d 905, 209 Cal. Rptr. 60, Allied had a contract to purchase raisins from Victor. Allied in turn had contracts to sell the raisins to Japanese firms. The difference in Allied's purchase price from Victor and its resale price abroad was $4,463. Heavy rains damaged the raisin crop, and the price of raisins went up. Victor defaulted, would not deliver the raisins to Allied, and conceded that it was in breach of contract. Allied did not cover (buy substitute raisins) but sued Victor, claiming that it was entitled to damages in the amount of about $150,000, the difference between the contract price with Victor and the market price at the time of the breach. The Court of Appeal had to decide whether Allied's remedy should be the market-contract formula loss of $150,000 or the prospective resale loss of $4,463. The Court of Appeal analyzed the Commercial Code and concluded that §1305(a) [at that time numbered §1106(1)], which states that the aggrieved party should be put in as good a position as if the other party had performed, prevails over the market-contract formula stated in §2713(1), and that the award to the aggrieved buyer should be limited to the amount it would have made on the transaction, which for Allied was $4,463. In *H-W-H Cattle Company v. Schroeder* (8th Cir. 1985) 767 F.2d 437 the court reached the same result under the Iowa UCC (identical in this respect to the CUCC), holding that the aggrieved buyer of cattle that were to be resold was entitled to the difference between its buying price and its selling price, not to the higher difference between its buying price and the market price.

If CMA had been able to exercise the purchase option, CMA probably would have included the Waterfront containers in the sale/leaseback with TAL in March 2012. (Michel, 68:5-68:25.) This would have taken effect when the Waterfront containers became property of CMA as of May 1, 2012. CMA and TAL did enter into a sale/leaseback for other containers in March 2012. (Exhibit D.) The prices in the CMA/TAL sale/leaseback were: $1,360 for a 20' unit, $1,700 for a 40' unit, and $1,980 for a 40HC unit. (Exhibit D, p.2; Michel, 65:1-65:21.)

Whether the sale prices to TAL were fair market prices, however, depends upon whether

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

the lease rates and other lease terms from TAL were at fair market value. The sale prices and the lease prices are related: the higher the sales prices, the higher the lease rates. CMA has produced the TAL/CMA container purchase agreement but, despite Waterfront's formal discovery demands for the leaseback terms that accompanied the sale, CMA has refused to produce them. (Exhibit P.) CMA has asserted that it has business reasons not to disclose the leaseback terms, even though the parties to this action entered into a confidentiality agreement that would protect against disclosure of those terms for purposes unrelated to the lawsuit. (Exhibit U.) Because CMA has refused to disclose the leaseback terms, CMA cannot prove and Waterfront cannot confirm that the sale prices to TAL were at market value. Moreover, the Court can infer from CMA's refusal to disclose the leaseback terms that such evidence is unfavorable to CMA. *UAW v. NLRB* (D.C. Cir. 1972) 459 F.2d 1329, 1335-1339.

Indeed, the evidence is that the CMA/TAL sales prices were inflated and were above fair market value. A sale/leaseback can constitute a de facto loan. (Passal, 129:22-130:1.) Assume that a container has a fair market value of $100, a fair market lease rate of $20 per year, and a residual value after 3 years of $60. If the buyer/lessor enters into a sale/leaseback for three years with the seller/lessee under those terms, the buyer/lessor would earn a profit over the three years of $20 ($60 in rent plus the residual value of $60 less the purchase price of $100). But the parties could agree to a different structure yielding the same profit: a selling price of $190 and a lease rate of $50 per year. At the end of the three years the buyer/lessor would have the same profit of $20 ($150 in rent plus the residual value of $60 less the purchase price of $190). In effect this would constitute a loan from the buyer/lessor to the seller/lessee, and sale/leasebacks sometimes serve this purpose. Passal called the CMA/TAL purchase prices "arbitrary" in the absence of the leaseback terms. (Passal, 113:22-114:6; 129:13-129:21.)

The CMA/TAL sale prices indeed were inflated above fair market value. The fair market values that would correspond to the market rental rates, the age of the containers, the prospective residual values, and the expected internal rate of return would be: $1,230 for a 20' unit, $1,551 for a 40' unit, and $1,888 for a 40HC unit. (Exhibit Q, pp. 6-10, 26.) Using those figures the difference between the market prices and the purchase option prices would total $3,494,256.

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

(See Exhibit T, p. 4.)

That figure, however, would be too high, because it includes the unreturned containers. According to Passal, in February 2014, when Waterfront sold to CMA at the purchase option prices the 2,590 containers CMA still held, the value of those containers still exceeded the purchase option prices. (Passal, 138:6-138:15.) To award CMA the differential between market prices and purchase option prices in May 2012 for the 2,590 unreturned containers and then also allow CMA to keep the differential between market prices and purchase option prices in February 2014 for those containers would constitute a double recovery by CMA. Passal estimated the fair market prices of the containers in February 2014 to be $1212 for a 20' unit, $1700 for a 40' unit, and $1860 for a 40HC unit. (Exhibit 27.) In February 2014 CMA purchased 1513 x 20' units, 253 x 40' units, and 824 x 40HC units. (Exhibit G.) Therefore according to Passal CMA already has received excess value of $1,286,946 above the purchase option prices for the unreturned containers. The computation is: (1513 x ($1212-$750)) + (253 x ($1700-$1200)) + (824 x ($1860-$1300)) = $1,286,946. That amount should be deducted from any award other than one based on the actual sales prices, i.e., an award based on Exhibit S.

### 2. CMA owes Waterfront $1,579,290 for failure to timely return the containers.

Waterfront is entitled to damages for CMA's failure to return the containers in the time required by Lease 7006 or as CMA confirmed following the mediation. This is separate from the issue of rental due.

Under Lease 7006 CMA was obligated to return all the containers within six months of the end of the lease. (Typed Clause 17; Kumar, 179:8-180:1.) The lease terminated on April 30, 2012, so CMA was obligated to redeliver all the containers by October 31, 2012. CMA returned only 1,334 containers by that date. CMA's failure to return the rest of the containers to Waterfront by that date constituted a breach of contract. This conclusion is consistent with the Court's prior ruling that the lease portion of Lease 7006 is a separate and enforceable agreement distinct from the sale contract embodied in the purchase option. The build-down period is part of the lease agreement, not part of the purchase option. The Court stated: "…CMA's exercise of

- 14 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

the purchase option would not have extinguished the lease agreement and the lessor-lessee relationship between the parties. Rather, any such exercise would have merely created a separate bilateral contract between the parties, with Waterfront as vendor and CMA as vendee." (Order, 05/31/13, Dkt. 19, at p. 5, italics in original.) The other provisions in Lease 7006, including the build down period, thus are contractually binding despite the dispute over the purchase option default term. See also CUCC §10201(d)(3).

Further, at the conclusion of the mediation on July 20, 2012, CMA confirmed its obligation to return the containers promptly, when CMA and Waterfront signed the following agreement: "While the parties did not reach an agreement on which they could settle their dispute, CMA has agreed, in response to Waterfront's demand, to return the leased containers as soon as reasonably practicable to do so, and CMA will begin this process by Monday, July 23, 2012." (Exhibit F.)

CMA could have returned the containers within six months of the end of the lease. CMA made no special effort to return them within that time, however, and instead returned them at CMA's convenience when CMA no longer needed to use them and they happened to be in a location where Waterfront had a depot to receive them. (Michel, 35:10-35:15, 53:17-54:5.) Waterfront agreed to accept redelivery of the containers at numerous locations in the major trading cities of Asia, North America, Europe, and elsewhere. (Exhibit C; Hu, 152:19-153:2.) CMA did not have to move empty Waterfront containers for redelivery but—without extra cost—could have used them to carry cargo to the many destinations where Waterfront would accept them, but CMA made no attempt to do that. (Michel, 54:14-54:24.) Michel admitted that CMA could have returned the containers within six months if it had specified to its agents to use the Waterfront containers on their next shipments to locations where Waterfront had a depot. (Michel, 56:9-56:19.) No one at CMA was assigned the task of ensuring that the Waterfront containers were returned within six months or within a "reasonably practicable" time. (Michel, 57:2-57:5.) Moreover, it is disingenuous for CMA to suggest that it could not return the containers within six months given that CMA had committed to do that in the build down clause if CMA chose not to exercise the purchase option, for instance if the prices of used containers in

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

early 2012 had fallen below the purchase option prices.

CMA's failure to return the containers not only constituted a breach of contract, it also constituted the tort of conversion. A conversion occurs where the defendant wrongfully exercises dominion over the property of another. *Gruber v. Pacific States Sav. & Loan Co.* (1939) 13 Cal. 2d 144, 148, 88 P.2d 137; *Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan* (2005) 129 Cal. App. 4th 692, 699, 28 Cal. Rptr. 3d 815. To establish conversion a plaintiff must show his ownership or right to possess the property at the time of the conversion, the defendant's disposition or conversion of the property by a wrongful act, and damages. *Burlesci v. Peterson* (1998) 68 Cal. App. 4th 1062, 1066, 80 Cal. Rptr. 2d 704. Waterfront still owned the containers under Lease 7006 even if Waterfront was in default of the purchase option. (Order, May 31, 2013, Dkt. No. 19, at 5:3-9; Lease 7006, Typed Clause 2, printed Clause 1.)

Conversion is a strict liability tort, and therefore the defendant's good faith, lack of knowledge, and motive are immaterial. *Burlesci, id.* The tort rests upon a party's interference with the owner's dominion over the property, and the interfering party's good faith or intent is no defense. *Id.* "Because the tort of conversion is a species of strict liability, defendant's good faith, ignorance, mistake or motive is irrelevant and does not constitute a defense." *Enterprise Leasing Corp. v. Shugart* (1991) 231 Cal. App. 737, 747-748, 282 Cal. Rptr. 620; *Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal. App. 4th 1383, 1387-8, 147 Cal. Rptr. 768. The California Supreme Court in *Edwards v. Jenkins* (1932) 214 Cal. 713, 7 P.2d 702 approvingly quoted the following from *Poggi v. Scott* (1914) 167 Cal. 372, 139 P. 815: "The plaintiff's right of redress no longer depends upon his showing, in any way, that the defendant did the act in question from wrongful motives, or generally speaking, even intentionally; and hence the want of such motives, or of intention is no defense. Nor, indeed, is negligence any necessary part of the case."

The plaintiff can sue for damages for conversion caused by the delay in return of property even though the defendant may have returned it before the trial. *Enterprise Leasing Corp. v. Shugart* (1991) 231 Cal. App. 737, 748, 282 Cal. Rptr. 620; *Irving Nelkin & Co. v. South*

- 16 -

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

*Beverly Hills Wilshire Jewelry & Loan* (2005) 129 Cal. App. 4th 692, 699-700, 28 Cal. Rptr. 3d 815.  Nor is it a defense to conversion that the defendant claims that the plaintiff owes money to the defendant.  *Gruber v. Pacific States Sav. & Loan Co.* (1939) 13 Cal. 2d 144, 148, 88 P.2d 137

Even though the defendant originally receives property lawfully, it has committed the tort of conversion if it fails to return the property when due or upon demand by a party entitled to possession.  *Enterprise Leasing Corp. v. Shugart* (1991) 231 Cal. App. 737, 282 Cal. Rptr. 620; *Messerall v. Fulwider* (1988) 199 Cal. App. 3d 1324, 245 Cal Rptr. 548; see also *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal. 3d 908, 918, 523 P.2d 662, quoting from Prosser's  Law of Torts: "Where B is in possession of the property, or where he has such control over it that he can readily get possession (as where he has stored it with a bailee), and A demands it, and B fails to deliver it, no modern court is going to save B from being a converter on the ground that there was only a nonfeasance."

In such cases the measure of damages for conversion is the difference between the value of the property when it should have been returned compared to the value of the property when it was returned.  In *Edwards v. Jenkins* (1932) 214 Cal. 713, 7 P.2d 702, the defendant stock brokers delayed in providing the share certificates to the plaintiff stock buyer, and during the delay the value of the stock decreased.  The California Supreme Court held that the broker owed the buyer the difference in market price between its value when it should have been delivered and its value when it was delivered.  See also *Tyrone Pacific International v. MV Eurychili* (9th Cir. 1981) 658 F.2d 664, 666-7 (construing Cal. Civil Code §3336, which sets forth the damages rule for conversion, to mean that where the owner has accepted return of the property, but its value has declined as a result of the conversion, he is entitled to the amount by which the value has declined).

On average Waterfront sold the containers CMA redelivered within 55 days of receipt. (Kumar, 203:15-203:19; Passal, 139:21-139:25.)  The market price for used containers dropped substantially from 2012 to 2013, and then dropped further in 2014.  If CMA had returned the containers by October 31, 2012, Waterfront could have sold the containers by the end of 2012 at

POST-TRIAL BRIEF BY WATERFRONT
Case No.:  C-12-05467-JSC

the higher prices then prevailing. Exhibit T, p.5, column C shows the prices Waterfront received for sales of the redelivered Lease 7006 containers during August-December 2012: $1,347 for a 20' unit, $1,903 for a 40' unit, and $2,125 for a 40HC unit. Instead CMA returned 3,256 containers after (often long after) October 31, 2012. CMA's delay forced Waterfront to sell the containers at the substantially lower 2013 and 2014 prices than Waterfront could have obtained if CMA had returned the containers when due. This is shown in Exhibit T, p. 5, column F. (Kumar, 202:19-205:1.) If CMA is held entitled to the differential between market prices and purchase option prices as of May 1, 2012, then Waterfront is entitled to offset that amount by the damages CMA caused Waterfront by not returning the containers by October 31, 2012, namely $1,579,290.

These damages have nothing to do with the age of the containers or CMA's use of them until redelivery. Waterfront obtained lower prices for the containers in 2013 and 2014 not because the containers were a year older—the difference in price between a used 10 year old container and a used 11 year old container is minimal—but because CMA's delay prevented Waterfront from selling the containers at 2012 market prices and forced Waterfront to sell them at the substantially decreased 2013-2014 market prices.

It would be an injustice to allow CMA to return the containers late but not bear the financial consequences. Failing to enforce the contractual redelivery date (October 31, 2012) would permit CMA to hold the containers for its own benefit at the financial risk of Waterfront. If the market went down, as it did in 2013, CMA could return the containers late, claim the May 2012 prices, and force Waterfront to suffer the loss of having to sell the containers at the low 2013-2014 prices. If the market instead had gone up in 2013 CMA could have held the containers and claimed for the 2013 market price, thus depriving Waterfront of the benefit of the rising market.

If the Court awards damages to CMA based on the market price on May 1, 2012, the best evidence of those damages is the difference between the purchase option prices and the fair market values in a sale/leaseback transaction. Attachment 2 and Exhibit T set forth the amount of those damages, and the net owing to Waterfront under that scenario would be $888,318.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

POST-TRIAL BRIEF BY WATERFRONT
Case No.: C-12-05467-JSC

## IV. Summary of Damages Calculations.

Under any scenario CMA owes Waterfront $213,637 under Lease 5004. Under Lease 7006 CMA owes Waterfront $2,589,647 for rental, total loss, and interest. The best evidence of the value of the Lease 7006 containers is the price they actually sold for. Using that measure of damages Waterfront owes CMA $1,349,546 for failing to consummate the purchase option. (Exhibit S, p. 4.) Thus the net amount that CMA owes Waterfront is $1,453,738 ($213,637 + $2,589,647 - $1,349,546). (Attachment 1 and Exhibit S.) That is the award that Waterfront requests.

If the Court applies May 1, 2012, prices instead, then those prices should be based on fair market values under a sale/leaseback. CMA would owe Waterfront $213,637 under Lease 5004 and $2,589,647 for rental, total loss, and interest under Lease 7006. Waterfront would owe CMA $3,494,256 for failing to consummate the purchase option, less $1,579,290 in damages CMA caused to Waterfront by not timely redelivering the containers. (Exhibit T, pp. 4-5.) Thus the net amount that CMA would owe Waterfront would be $888,318 ($213,637 + $2,589,647 - $3,494,256 + $1,579,290). (Attachment 2 and Exhibit T.)

Unlike Waterfront, CMA did not set forth its damages claims in any specific way in its Trial Brief or during the trial. CMA, primarily through Passel, issued a lot of numbers, but CMA did not actually specify what amount it was claiming, either by number or by category and methodology. Under FRCP Rule 26(a)(1)(A)(iii) CMA in its Initial Disclosure (to be supplemented thereafter) was obligated to provide "a computation of each category of damages claimed by the disclosing party," but even after the trial Waterfront has to guess as to what amount CMA is requesting in damages, and on exactly what basis. Waterfront therefore cannot in this Brief directly address the damages amounts that CMA will claim in its Post-Trial Brief. That unfairly disadvantages Waterfront.

## V. Conclusion.

Both parties breached Lease 7006, Waterfront by not fulfilling the purchase option, and CMA by defaulting on per diem and other charges (before and after May 2012) and by failing to redeliver the containers when due. The purpose of the damages provisions in the California

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

Commercial Code and at law is to put the parties in the same financial positions as if the breaches not occurred, not to grant windfalls to a nonbreaching party or to punish a party who breached. Waterfront's proposed damages figures based on actual sales (Attachment 1 and Exhibit S) would achieve those ends. Conversely, CMA apparently claims damages in amounts that would constitute a windfall to it and put it in a better financial position than if the purchase option had been consummated, and (due to CMA's failure to timely return the containers) would put Waterfront in a substantially worse financial position than if the purchase option had been consummated.

Waterfront requests that the Court award it the damages set forth in Attachment 1 and Exhibit S: $1,453,738.

Dated: July 14, 2014

EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
Eric Danoff
Katharine Essick

By_____/s/ Eric Danoff_____
Attorneys for Defendant and Counterclaimant
Waterfront Container Leasing Co., Inc.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

Due to Waterfront for Lease 5004                     $213,637

Due to Waterfront for Lease 7006                     <u>$1,240,101</u>

Total Due to Waterfront                              $1,453,738

Note 1.  Lease 5004.  Interest increased to $36,879.  All other amounts remain the same as in Exhibit S.

Note 2.  Lease 7006.  Interest on rental increased to $171,918.  See attached Interest Computation.  All other amounts remain the same as in Exhibit S.

| | |
|---|---|
| Due to Waterfront for Lease 5004 | $213,637 |
| Due to Waterfront for Lease 7006 | <u>$674,681</u> |
| Total Due to Waterfront | $888,318 |

Note 1. Lease 5004. Interest increased to $36,879. All other amounts remain the same as in Exhibit T.

Note 2. Lease 7006. Interest on rental increased to $171,918. See attached Interest Computation. Interest on total loss units increased to $1,685. All other amounts remain the same as in Exhibit T.

**Interest Computation for #7006 July 31st 2014**

**Rental**

| Period | Unpaid Invoices | Reduction | Interest @18% |
|---|---|---|---|
| May 31, 2012 | $0.00 | $0.00 | $0.00 |
| June 30, 2012 | $48,486.31 | $0.00 | $18,083.22 |
| July 31, 2012 | $231,435.29 | $100,000.00 | $47,944.85 |
| August 31, 2012 | $411,731.59 | $200,000.00 | $75,623.98 |
| September 30, 2012 | $558,961.70 | $300,000.00 | $91,182.74 |
| October 31, 2012 | $710,170.19 | $400,000.00 | $107,294.48 |
| November 30, 2012 | $858,194.43 | $500,000.00 | $121,596.94 |
| December 31, 2012 | $1,004,587.46 | $600,000.00 | $134,797.98 |
| January 31, 2013 | $1,148,186.35 | $700,000.00 | $146,537.43 |
| February 28, 2013 | $1,275,458.17 | $800,000.00 | $153,463.72 |
| March 31, 2013 | $1,412,530.31 | $900,000.00 | $162,367.13 |
| April 30, 2013 | $1,538,134.16 | $1,000,000.00 | $168,124.84 |
| May 31, 2013 | $1,660,676.35 | $1,100,000.00 | $172,860.55 |
| June 30, 2013 | $1,776,272.23 | $1,200,000.00 | $175,879.02 |
| July 31, 2013 | $1,885,377.66 | $1,300,000.00 | $177,517.99 |
| August 31, 2013 | $1,982,355.26 | $1,400,000.00 | $177,020.17 |
| September 30, 2013 | $2,067,158.49 | $1,500,000.00 | $174,749.40 |
| October 31, 2013 | $2,147,501.12 | $1,600,000.00 | $172,102.92 |
| November 30, 2013 | $2,147,501.12 | $1,700,000.00 | $160,168.67 |
| December 31, 2013 | $2,147,501.12 | $1,800,000.00 | $149,713.88 |
| January 31, 2014 | $2,347,404.17 | $0.00 | $167,524.73 |
| February 28, 2014 | $2,384,144.00 | $0.00 | $171,843.51 |
| March 31, 2014 | | $0.00 | $171,843.51 |
| April 30, 2014 | | $0.00 | $171,918.37 |
| May 31, 2014 | | $0.00 | $171,918.37 |
| 30-Jun-14 | | $0.00 | $171,918.38 |
| 31-Jul-14 | | $0.00 | **$171,918.38** |